**UNITED STATES of America, Appellant,**

v.

**Julio GORI, Defendant,**

**Sorin Pichardo and Victor Rosario, Defendants–Appellees.**

**Docket Nos. 99–1568, 99–1569.**

United States Court of Appeals, Second Circuit.

Argued: Feb. 22, 2000

Decided: Oct. 18, 2000

Ira M. Feinberg, Assistant United States Attorney, Southern District of New York, (Mary Jo White, United States Attorney for the Southern District of New York, Mark F. Mendelsohn, Jennifer L. Borum, Assistant United States Attorneys, Lewis J. Liman, Special Assistant United States Attorney, on the brief), for Appellant.

David J. Goldstein, Bronx, N.Y. (Elliot Fuld, Christopher Booth, Michael J. Nedick, Goldstein, Weinstein & Fuld, on the brief), for Defendants–Appellees.

Before: JACOBS, SOTOMAYOR and MICHEL,* Circuit Judges.

Judge SOTOMAYOR dissents in a separate opinion.

JACOBS, Circuit Judge:

The United States appeals from orders of the United States District Court for the Southern District of New York (Patterson,

---

* The Honorable Paul R. Michel, of the United States Court of Appeals for the Federal Cir-

J.) granting defendants-appellees' motions to suppress evidence, and denying the government's motion for reconsideration. In a nutshell, police officers who were on surveillance in the hallway of an apartment building, watching the door of a narcotics stash house, were surprised by the arrival of a woman delivering an order of hot food to the stash house. They allowed her to follow through on her delivery, and through the opened door directed that the occupants step outside and submit to a brief investigatory detention. The district court held that the police thus made a constructive entry into a private residence in violation of the Fourth Amendment's warrant requirement.

We reverse, holding (1) that occupants of a known stash house, having voluntarily exposed themselves to public view by answering the door to receive their food delivery, had no reasonable expectation of privacy against being seen by persons standing in a public hallway; and (2) that once they were seen, in the absence of unreasonable police conduct, the occupants' temporary seizure in the course of a limited investigation does not constitute a violation of the Fourth Amendment.

## BACKGROUND

The district court opinions in this case are reported at *United States v. Gori*, No. 98 CR. 1163(RPP), 1999 WL 322651 (S.D.N.Y. May 20, 1999) (granting defendants-appellees motion to suppress) (*"Gori I"*); and *United States v. Gori*, No. 98 CR. 1163(RPP), 1999 WL 816172 (S.D.N.Y. Oct.13, 1999) (denying government's motion for reconsideration) (*"Gori II"*). We assume familiarity with the facts as set out at length by the district court, and recount in this opinion only such facts as bear upon our resolution of the issues presented on appeal.

cuit, sitting by designation.

## A. *Facts*

Pedro Mora was arrested in possession of a kilogram of cocaine on October 12, 1998, and immediately cooperated with the police. Mora paged his drug source, defendant Julio Gori, who called back. As police officers listened in, Mora told Gori that he had two customers and wanted to pick up two kilos of cocaine. Gori agreed and invited Mora to come by later that afternoon.

Accompanied by two New York City police officers, Mora went to the apartment building Mora identified as the location where Gori had delivered kilogram quantities of cocaine to Mora in the past. From an unmarked car, Det. Amando Rodriguez and Sgt. Diane Contreras watched as two men entered the building. Mora identified one as Gori; the other was later identified as defendant-appellee Sorin Pichardo. Det. Rodriguez left the car, followed both men, and saw them enter Apartment 1M.

Mora telephoned Gori fifteen minutes later to say that he was waiting in front of the building. Gori then came out of the building carrying a small black shopping bag and approached what he thought was Mora's parked vehicle. Coming up from behind Gori, Det. Rodriguez displayed his shield, and said "Police, stop!" Gori froze and dropped the bag, and Sgt. Contreras moved in to place Gori under arrest. Det. Rodriguez discovered two yellow packages in the bag, each of which contained a kilo of cocaine. Gori said in Spanish that someone in the apartment building had given him the bag.

Det. Rodriguez, Sgt. Contreras and another officer set up surveillance in the lobby of the apartment building pending further instructions from their lieutenant, who was not there yet. Twenty to thirty minutes passed; no one entered or left Apartment 1M; and the lieutenant did not arrive. At that point, a woman entered the apartment lobby with a delivery order of hot food for Apartment 1M. According to Det. Rodriguez's testimony, he worried (1) that if he prevented the delivery, the hungry occupants might investigate the delay and be alerted to the officers' presence, and (2) that if he let the delivery be made, the delivery woman might betray their presence, inadvertently or otherwise. Det. Rodriguez and Sgt. Contreras decided to accompany the delivery woman to Apartment 1M.

The delivery woman stood in front of the door to Apartment 1M, with Det. Rodriguez to her left, and Sgt. Contreras just off to the right. Both officers had their guns drawn but at their sides and pointed to the floor. The delivery woman knocked on the door, and the door was opened wide. Both officers immediately displayed their shields, and Det. Rodriguez said, "Everyone step out into the hallway!" Det. Rodriguez testified that from his spot in the hallway, he could see five people through the open door (two men, two women and a child), including defendant-appellee Victor Rosario. A moment later, Pichardo (who had earlier been observed arriving at the apartment building with Gori) emerged from a bedroom in the rear of the apartment. All six occupants stepped into the hallway, where they were told to stand against the wall. Sgt. Contreras testified that at this point the occupants were not free to leave.

The officers re-holstered their weapons and brought a handcuffed Gori into the hallway area. Det. Rodriguez asked the occupants who owned Apartment 1M. Rosario identified himself as the owner of the apartment, at which point Det. Rodriguez asked Rosario if he knew "the fat guy," motioning at Gori. Rosario looked at Gori, nodded and hesitated. Then, either Rosario or Det. Rodriguez (it is unclear on the present record) asked to speak in private. Rosario moved back into the apartment and Det. Rodriguez and Sgt. Contreras followed. Rosario then told both officers that "[t]he only thing I know" about Gori "is that he gave me a thousand dollars to hold a bag for him."

Rosario then consented to a search of the apartment, and Det. Rodriguez prepared a handwritten consent to search form, which Rosario signed.[1] Det. Rodriguez asked Rosario about the bag he was holding for Gori, and Rosario took Det. Rodriguez and Sgt. Contreras to the bedroom where he opened an armoire and pulled out a bag containing five kilograms of cocaine. The officers left the bag in the armoire and returned to the hallway to maintain control of the other occupants.

A half-hour later, New York Police Department ("NYPD") Lieutenant Ciaran Timoney arrived bearing a Spanish-language consent-to-search form of the kind used by the Drug Enforcement Agency ("DEA"). Det. Rodriguez handed the form to Rosario, advised him to read it, and explained it to him. Rosario signed the form and the officers conducted a full search of the apartment, beginning with the armoire. Seized from the apartment were five kilograms of cocaine as well as dilutants, documents, drug paraphernalia and $15,000 in cash. The officers placed Rosario and Pichardo under arrest, and transported them (and Gori) to the DEA's offices, where all three defendants were read *Miranda* warnings. Pichardo signed a form waiving his rights and stated that he knew that the other defendants were drug dealers but claimed that he did not know that there had been drugs in the apartment at that time.

### B. *Motion to Suppress*

In indictments returned on October 22, 1998, Gori, Rosario and Pichardo were charged with conspiracy to distribute cocaine, in violation of Title 21, United States Code, Section 846. Pre-trial, Rosario and Pichardo moved to suppress the physical evidence seized from Apartment 1M and the statements that they made, on the grounds (1) that the police entered the

apartment in violation of the Fourth Amendment, before they had obtained consent and in the absence of exigent circumstances; (2) that Rosario's consent was invalid because the officers had coerced him into signing the written consent form; and (3) that their statements were the fruits of unlawful arrests made before *Miranda* rights were read.

### C. *The District Court's Decision*

The district court's opinion of May 20, 1999 granted the suppression motions. The court first found that the officers had "reasonable suspicion entitling them to carry out an investigation of ... Apartment 1M" since

> Rodriguez had seen Gori entering Apartment 1M ... and exiting the building thereafter in response to Mora's telephone call, carrying a bag that turned out to be cocaine. A logical conclusion was that Gori could have a stash and that it could be in Apartment 1M.

*Gori I*, 1999 WL 322651, at *6 (internal quotation marks and citations omitted). The court credited the officers' testimony and ruled that "specific, articulable facts existed to support a reasonable suspicion that evidence of criminal activity might exist in Apartment 1M." *Id.* The court further found that Rosario consented to the officers' entry, and then consented to their search of the apartment, and that both consents were voluntary. *Id.* at *9–*10.

The court concluded nevertheless that all of the evidence found in the apartment and all of the statements made by Rosario and Pichardo had to be suppressed on the ground that the officers' oral directive that the apartment occupants step into the hallway constituted an unlawful seizure in violation of the Warrant Clause of the Fourth Amendment. *See id.* at *6–*9, *11. The court reasoned that the officers "seized the

---

1. Rosario claims on appeal that the word "revise" which appeared on the consent form is not commonly understood in Spanish to mean "search." But this issue was raised

and rejected in the district court, which credited the testimony of a Spanish translator. *See Gori I*, 1999 WL 322651, at *3 n. 5.

occupants of Apartment 1M through a show of police authority and the issuance of orders to which the occupants submitted." *Id.* at *7. The court went on to hold that the seizure was unconstitutional, because it was made pursuant to a warrantless constructive entry into a home that did not fall into any of the exceptions to the warrant requirement. *See id.* at *7–*8.

The court's Fourth Amendment analysis relied on the Supreme Court's admonition in *Payton v. New York*, 445 U.S. 573, 588–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that police officers must obtain a warrant before physically entering a home in the course of making a felony arrest. The district court credited the officers' testimony that they did not physically cross the threshold of Apartment 1M, *see Gori I*, 1999 WL 322651, at *8, but reasoned that their oral directive from outside constituted an "entry" into the apartment sufficient to implicate the *Payton* rule:

> The defect in this case is thus not the absence of reasonable suspicion to conduct a *Terry* stop and an investigation, but the seizure of defendants Rosario and Pichardo by ordering them out of the apartment with guns drawn while they were inside Apartment 1M in violation of *Payton.* Reasonable suspicion might have supported a brief investigation of the occupants of Apartment 1M if they had been encountered outside the apartment. However, in this case, the use of force to compel the investigatory stop did not occur on the street but was directed at a private residence—a place entitled to special consideration under the Fourth Amendment. Here, Det. Rodriguez and Sgt. Contreras were not in possession of a warrant of any kind. . . . Thus, the seizure of the occupants of Apartment 1M violated the Fourth Amendment.

*Id.* at *8 (internal quotation marks and citations omitted).

The court concluded that the *Payton* violation tainted Rosario's statements (that he was the owner of the apartment, that he knew Gori, and that Gori had paid him to hold a bag), Rosario's two consents to search the apartment, and Pichardo's statement that he knew the others were drug dealers. *See id.* at *9–*12. Evidence bearing that taint was ordered suppressed. The government's motion for reconsideration was denied. *See Gori II*, 1999 WL 816172, at *3.

## DISCUSSION

"[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). It appears uncontested that the occupants of Apartment 1M, upon being ordered into the hallway, were "seized" within the meaning of the Fourth Amendment. A person can be seized without being physically restrained where "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion of Stewart, J.); *see also Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen"). We agree with the district court that Det. Rodriguez and Sgt. Contreras seized the occupants of Apartment 1M through a show of police authority and the issuance of orders to which the occupants submitted. *See United States v. Gomez*, 633 F.2d 999, 1002, 1004 n. 6 (2d Cir.1980) (seizure occurs when police from fifteen feet away display their badge and shout "police" since " '[a] reasonable person would have believed that he was not free to leave' " (quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870)).

Whether or not the seizure in this case violated the Fourth Amendment depends on whether or not—under all of the cir-

cumstances—the officers' order to evacuate Apartment 1M triggers the heightened protection offered by *Payton* against warrantless entry into the home. If it does (as the district court found), then the order was unconstitutional unless the government can establish that one of the five exceptions to the warrant requirement apply to the facts of this case, a showing that the government does not undertake. *See United States v. Restrepo*, 890 F.Supp. 180, 205 (E.D.N.Y.1995) (delineating such exceptions for residential searches). But if *Payton* and the warrant requirement are not implicated (and we conclude that they are not), then the order to evacuate the apartment and the incidental seizure of its occupants were lawful so long as the officers acted reasonably under the totality of circumstances. *See Terry*, 392 U.S. at 20, 88 S.Ct. 1868 (noting that "an entire rubric of police conduct" is not subject to the warrant procedure but "[i]nstead . . . must be tested by the Fourth Amendment's *general proscription against unreasonable searches and seizures*") (emphasis added).

A.  *Payton and the Warrant Requirement*

▇ The Fourth Amendment's warrant requirement protects one's privacy interest in home or property. Absent exigent circumstances or some other exception, the police must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy. *See Maryland v. Dyson*, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (per curiam) ("The Fourth Amendment generally requires police to secure a warrant before conducting a search." (citing *California v. Carney*, 471 U.S. 386, 390–91, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985))).

▇ Absent a reasonable expectation of privacy, however, the warrant requirement is inapplicable and the legitimacy of challenged police conduct is tested solely by the Fourth Amendment's requirement that any search or seizure be reasonable. *See*

*Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) ("[T]he touchstone of [Fourth] Amendment analysis [is] the question whether a person has a 'constitutionally protected reasonable expectation of privacy.'" (quoting *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring))); *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) ("The Fourth Amendment protects legitimate expectations of privacy rather than simply places. If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause.").

▇ No reasonable expectation of privacy inheres in what is left "'visible to the naked eye.'" *Florida v. Riley*, 488 U.S. 445, 450, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (quoting *California v. Ciraolo*, 476 U.S. 207, 215, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)). Thus the Fourth Amendment does not require a police officer to obtain a warrant before making a felony arrest in a public place, *see United States v. Watson*, 423 U.S. 411, 418 n. 6, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); or seizing an item in plain view if there is cause to believe that it is evidence of crime, *see Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); or conducting surveillance of a fenced backyard from a plane 1000 feet above, *see Ciraolo*, 476 U.S. at 213–15, 106 S.Ct. 1809. "[T]he threshold question" in this case is therefore whether the defendants exhibited a "legitimate expectation of privacy" when they were ordered out of their apartment. *United States v. Smith*, 621 F.2d 483, 486 (2d Cir.1980); *accord Bond v. United States*, 529 U.S. 334, 120 S.Ct. 1462, 1465, 146 L.Ed.2d 365 (2000) ("First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that 'he [sought] to preserve [something] as private.'" (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)));

*United States v. Pena,* 961 F.2d 333, 337 (2d Cir.1992).

■ Fourth Amendment privacy interests are most secure when an individual is at home with doors closed and curtains drawn tight. Thus "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton,* 445 U.S. at 586, 100 S.Ct. 1371; *see id.* at 576, 100 S.Ct. 1371 (prohibiting "the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest"). The *Payton* rule, upon which the district court relied, is directed primarily at warrantless *physical* intrusion into the home. *See id.* at 585–86, 100 S.Ct. 1371 ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal quotation marks and citation omitted)); *id.* at 590, 100 S.Ct. 1371 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not be crossed without a warrant."); *id.* at 589, 100 S.Ct. 1371 ("In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home[.]"); *New York v. Harris,* 495 U.S. 14, 17, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) ("*Payton* was designed to protect the physical integrity of the home[.]"). It is unclear whether *Payton*'s solicitude is aroused when a dwelling is penetrated by the voice of a police officer standing outside. *Compare United States v. Carrion,* 809 F.2d 1120, 1128 (5th Cir.1987) (finding *Payton* inapplicable where "arrest was effected before the agents entered [the defendant's] hotel room"), *with United States v. Morgan,* 743 F.2d 1158, 1166 (6th Cir. 1984) (warrant required before police can use coercion to draw suspect out of home

regardless of whether police enter), *and United States v. Johnson,* 626 F.2d 753, 757 (9th Cir.1980) (warrant required where suspect opens door to officers who misrepresent their identities).

The facts of this case, however, do not draw us into that debate.[2] *Payton* does not hold or suggest that the home is a sanctuary from reasonable police investigation. *See, e.g., Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from *unreasonable* government intrusion." (emphasis added)); *United States v. Lovelock,* 170 F.3d 339, 343–44 (2d Cir.1999) ("What a citizen is 'assured by the Fourth Amendment ... is not that no government search of his house will occur' in the absence of a warrant ... 'but that no such search will occur that is unreasonable.' " (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 183, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (first alteration in original) (additional internal quotation marks omitted))); *United States v. Holland,* 755 F.2d 253, 255 (2d Cir.1985) ("[*Payton* ] recognized the existence of a *limited* right of privacy against an arrest in the suspect's home[.]" (emphasis added)). Like any thread of Fourth Amendment jurisprudence, *Payton* protects an individual's privacy interest; thus, "[w]hat a person knowingly exposes to the public, *even in his own house* or office, is not a subject of Fourth Amendment protection." *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (emphasis added) (quoting *Katz,* 389 U.S. at 351, 88 S.Ct. 507 (internal quotation marks omitted)); *see also United States v. Fields,* 113 F.3d 313, 321–22 (2d Cir.1997) (where blinds are raised, police are entitled to peer through

---

**2.** Given the narrow question raised by the distinctive facts in this case, we do not consider the questions presented when police surround a dwelling, flood it with searchlights, and order evacuation over a bullhorn. *See, e.g., Morgan,* 743 F.2d at 1164–67 (finding a *Payton* violation on similar facts); *Sharrar v.*

*Felsing,* 128 F.3d 810 (3d Cir.1997) (finding *Payton* violation where "SWAT team surrounds a residence with machine guns pointed at the windows and then persons inside are ordered to leave the house backwards with their hands raised").

back window of home since "what a person chooses voluntarily to expose to public view thereby loses its Fourth Amendment protection"). The dissent characterizes our position as holding that the opening of the door to a home transforms the entire home into a public place. This generalizes the holding and reach of the opinion beyond its scope or ambition. The facts critical to the analysis are that the interior of Apartment 1M was exposed to public view when the door was voluntarily opened. And the principle that governs those facts is found in *United States v. Santana*, not *Payton*.

In *Santana*, police officers went to a known stash house to arrest a suspect who had earlier sold drugs to an undercover officer. The police were fifteen feet from the house when they saw the suspect standing in the doorway. They displayed their identification and shouted "police." *See Santana*, 427 U.S. at 40, 96 S.Ct. 2406. The suspect retreated into the vestibule of her house, the officers followed her through the open door, and she was arrested after a scuffle.[3] The Supreme Court ruled that the warrantless arrest did not violate the heightened Fourth Amendment protections of *Payton*, because a suspect exposed to public view through an open doorway, even at home, cannot claim a protected privacy interest that triggers the warrant requirement:

> While it may be true that under the common law of property the threshold of one's dwelling is "private," ... it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in

his own house or office, is not a subject of Fourth Amendment protection." *Id.* at 42, 96 S.Ct. 2406 (quoting *Katz*, 389 U.S. at 351, 88 S.Ct. 507). A suspect in her open doorway becomes "as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* This analogy is adaptable to the facts here, because when the defendants voluntarily opened the door of Apartment 1M in response to a knock from the delivery person whom they invited, they created a vista from a public place or common area. *Cf. Riley*, 488 U.S. at 449, 109 S.Ct. 693 ("[T]he police may see what may be seen from a public vantage point...." (internal quotation marks omitted)); *Fields*, 113 F.3d at 321 ("[T]he police are free to observe whatever may be seen from a place where they are entitled to be" and "what a person chooses voluntarily to expose to public view thereby loses its Fourth Amendment protection.").

Courts applying *Santana* confirm that conclusion. *See United States v. Vaneaton*, 49 F.3d 1423, 1425, 1427 (9th Cir.1995) (*Payton* not violated by warrantless arrest at door of motel room where suspect opened door after viewing uniformed officers knocking at his door, officers "ha[d] not used coercion, and the suspect acquiesce[d] to the encounter"); *United States v. Berkowitz*, 927 F.2d 1376, 1387 (7th Cir.1991) (warrantless arrest of suspect who opened door in response to agent's knock not violate *Payton* when person "recognizes and submits to that authority"); *Carrion*, 809 F.2d at 1128 (*Payton* not violated by warrantless arrest of suspect standing in open doorway of hotel room); *United States v. Herring*, 582 F.2d 535, 543 (10th Cir.1978) (no expectation of privacy where defendant opens door in response to officer's knock).[4]

---

3. Breaking the threshold of the doorway triggered the warrant requirement, but the Court found the officer's entry into Santana's home justified by an exigent circumstance. *See Santana*, 427 U.S. at 42–43, 96 S.Ct. 2406 (discussing "hot pursuit" exception to the warrant requirement).

4. Because the defendants opened the door in response to a knock initiated by someone whom they invited—not by the police or someone acting as a subterfuge for the police—we need not consider whether a suspect loses the heightened protection of *Payton* merely by opening a door in response to a

Applying the *Santana* principle, we hold that the warrant requirement and the heightened protections established for the home in *Payton* are not implicated here: Once the apartment was opened to public view by the defendants in response to the knock of an invitee, there was no expectation of privacy as to what could be seen from the hall. The officers therefore needed no warrant to temporarily "seize" the occupants and conduct a limited investigation, and such an investigation is constitutional so long as it was reasonable in all the circumstances.[5]

\* \* \*

The defendants argue that (1) *Santana* is limited to situations where police have probable cause to arrest a suspect standing in plain view and does not extend to situations where police have only a reasonable suspicion that criminal activity is afoot; (2) the warrantless arrest of Santana did not implicate *Payton* because Santana was standing at the threshold of a doorway rather than inside; and (3) this court's holding in *United States v. Crespo*, 834 F.2d 267 (2d Cir.1987) disapproves the government's interpretation of *Santana.* We reject these arguments.

First, as discussed below in some detail, it is undisputed that officers Rodriguez and Contreras had " 'reasonable suspicion'

entitling them to carry out an investigation of where Gori obtained the cocaine by questioning the occupants of Apartment 1M." *Gori I*, 1999 WL 322651, at \*6; *see, e.g., United States v. Bold*, 19 F.3d 99, 102 (2d Cir.1994) ("A police officer may, in appropriate circumstances and in an appropriate manner, stop a person for purposes of investigating possibly criminal behavior, even though there is no probable cause to make an arrest."). The defendants argue that reasonable suspicion is not enough because the *Santana* exception to *Payton* is limited to circumstances in which officers have probable cause to arrest a suspect exposed to public view. We see no basis for that limitation. The *Santana* analysis, which supports the warrantless *arrest* of a suspect who has no legitimate expectation of privacy, *a fortiori* allows the lesser intrusion of a brief investigatory detention. *See Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 677, 145 L.Ed.2d 570 (2000) (investigatory detention "is a far more minimal intrusion" than arrest); *United States v. Place*, 462 U.S. 696, 705, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (same).

Next, defendants contend that *Santana* is purely a doorway case, and has no bearing on whether a person sitting on a couch at the far end of an exposed room enjoys a protectible privacy interest. But the prin-

knock by law enforcement. *Compare Vaneaton*, 49 F.3d at 1427 (recognition and submission to police authority required), *and Berkowitz*, 927 F.2d at 1387 (same), *with Carrion*, 809 F.2d at 1128 (no expectation of privacy when open door in response to knock, even if police use subterfuge), *and Herring*, 582 F.2d at 543 (*Payton* inapplicable whenever suspect opens a door).

**5.** Appellee Pichardo emphasizes that when the door was opened, he was in a rear bedroom where (unlike the other occupants) he was not visible until he emerged when Det. Rodriguez asked everyone to step out into the hallway. The district court found that Det. Rodriguez remained in the public hall, "identified himself as a police officer and said, 'Everyone step out into the hallway.' " *Gori I*, 1999 WL 322651, at \*2. Pichardo presented himself before he could observe an unholstered weapon, and without any use or threat

of force. On those facts Pichardo had no reasonable expectation of privacy after emerging into public view, and his liberty interest is therefore subject to the same reasonableness inquiry as the other occupants. *See Holland*, 755 F.2d at 255 (tenant who enters common hallway upon seeing police officer loses protection of warrant requirement); *Berkowitz*, 927 F.2d at 1387 (no right of privacy where defendant voluntarily submits to police authority by opening door of home at approach of police); *United States v. Mason*, 661 F.2d 45, 47 (5th Cir.1981) (same); *but see Morgan*, 743 F.2d at 1166 (warrant required where defendant's exposure to public view was the result of "coercive police behavior"); *United States v. Al–Azzawy*, 784 F.2d 890, 893 (9th Cir.1985) (suspect "only emerged under circumstances of extreme coercion").

ciple of *Santana,* as confirmed in the circuit cases that apply it, is that the warrant requirement depends on the suspect's actual expectation of privacy. No one in a place opened to public view can expect privacy in that place and at that time, whether the suspect is on the threshold, in a vestibule or at the far end of an exposed interior room. Once a door is voluntarily opened by an occupant in response to a knock by someone invited by an occupant, the Fourth Amendment's protection of the home is not abrogated so long as the officer's conduct was reasonable under the circumstances.

*Santana* says that the suspect in that case was "standing directly in the doorway—one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." 427 U.S. at 40 n. 1, 96 S.Ct. 2406. We read this passage as descriptive, not as the formulation of a rule under the Fourth Amendment. The Court elsewhere has warned against employing "metaphysical subtleties" to resolve Fourth Amendment challenges, *see Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), and we therefore doubt that it is appropriate to resolve a *Payton* challenge on the basis of a suspect's placement within a visible scene. The idea that *Santana* turns on the defendant's location is, according to Professor LaFave, "unsound from the standpoint of both principle and pragmatism," because "even if courts could be expected to sort out the 'in'-'at' and 'on'-'by' distinctions on a regular basis, one cannot help but wonder why that burden should be imposed upon them." 3 *Search and Seizure* § 6.1(e), at 256–57 (citing *Duncan v. Storie,* 869 F.2d 1100, 1102 (8th Cir.1989) (admonishing that it is "unwise to become preoccupied with the exact location of the individual in relation to the doorway")). A person who opens the door to a dwelling in response to a knock by an invitee opens to view whatever can be seen by a nosy neighbor or an observant police officer. Those inside exhibit no actual expectation of privacy and therefore lose the heightened constitutional protection that might flow from such an expectation.

*United States v. Crespo,* 834 F.2d 267 (2d Cir.1987), is not to the contrary. There, we said in *dictum* that *Santana* would not apply if the door was opened in response to an informer's knock, if "the door to the apartment was at most half-opened, and ... [if] that degree of exposure was induced by [officers] who were seeking to flush [the suspect] out." *Id.* at 270. The facts of *Crespo* were that a visible "display of weapons, together with the [federal] agents' kicking the door, caused the door to be opened by threat of force and not with consent." *Id.* at 269. Remotely similar facts are not presented in this appeal and we reject any analogy to the facts of *Crespo* or (for that matter) its embedded hypotheticals.

### B. *Fourth Amendment Reasonableness*

Once it is decided that no warrant was needed, "the central inquiry" under the Fourth Amendment becomes "reasonableness in all the circumstances." *Terry,* 392 U.S. at 19, 88 S.Ct. 1868. " '[T]he touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security,' " and "reasonableness 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Maryland v. Wilson,* 519 U.S. 408, 411, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (quoting *Pennsylvania v. Mimms,* 434 U.S. 106, 108–09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (additional internal quotation marks omitted)).

■ We conclude that officers Rodriguez and Contreras acted reasonably at every stage of the "swiftly developing situation" presented on this record. *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (in as-

sessing reasonableness under *Terry,* courts "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing"). Based on the exigencies of the moment—one following the other—what the police did, said and asked at each stage of the encounter was reasonable from a Fourth Amendment perspective. The police had no obvious option, given the circumstances, other than to proceed as they did.[6]

The district court found that Det. Rodriguez and Sgt. Contreras had reasonable suspicion that Apartment 1M was being used as a "stash" for narcotics and that the occupants of the apartment might be involved in narcotics trafficking. *See Gori I,* 1999 WL 322651, at *6. We agree. *See United States v. Martinez–Gonzalez,* 686 F.2d 93, 99 (2d Cir.1982) ("[I]nformation the agents had when they placed apartment 7F under surveillance created strong suspicions based on their experience that 7F was being used as a 'stash pad' for drugs ... and therefore justified them in detaining for purposes of a *Terry* stop any persons seen entering or exiting." (internal quotation marks and citations omitted)).

The encounter at the door of Apartment 1M was precipitated by the arrival of the food delivery ordered by the occupants. The situation reasonably called for some immediate measures, and we conclude that accompanying the delivery woman to the door was a reasonable course of action in the circumstances, if not the only or necessary one. If they let the delivery woman proceed unaccompanied after seeing police in the foyer, she might betray their presence intentionally or by her alarm; if they turned her away, the hungry occupants might have called the take-out restaurant to complain about the delay, and been alerted that way. The police could assume that once alerted, the occupants might have disposed of the contraband by the

window or the toilet, or might have precipitated violence. *Cf. Michigan v. Summers,* 452 U.S. 692, 702–03, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (recognizing that police presence "may give rise to sudden violence or frantic efforts to conceal or destroy evidence"); *United States v. Medina,* 944 F.2d 60, 68–69 (2d Cir.1991) (warrantless arrest and entry proper "to prevent the destruction or moving of the evidence" because of non-return of arrested accomplice in drug conspiracy); *United States v. Clement,* 854 F.2d 1116, 1119–20 (8th Cir. 1988) (reasonable for officers to believe that non-return of the defendant's associates would warn defendant that drug sale had failed and would prompt defendant to destroy evidence).

One salient defect of the dissent is its failure to prescribe what the police should have done within the proper parameters of the Constitution. The reasonableness under the Fourth Amendment of any *Terry* stop is by definition fact-specific. *See Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868 (making reasonableness determination requires assessing facts available to officer at the moment of search or seizure). Under the facts presented on this appeal, the constitutional principles urged by the dissent would offer the police the options of (i) risking disclosure of their surveillance position with concomitant dangers, such as violent confrontation and destruction of evidence, or (ii) risking their lives, the lives of the apartment inmates (including a child) or the life of the delivery person.

Under the circumstances, it was reasonable for the officers to flank the delivery person when she knocked. And when the door was opened, and the occupants and the police could see each other, it was reasonable for the police to ask the occupants of a known narcotics stash house to step outside for the purposes of a limited investigation: otherwise, the officers would

---

**6.** The dissent treats the descriptive word "exigencies" in this paragraph as a term of art.

We do not hold that the police conduct here was justified by exigent circumstances.

have been exposed to danger.[7] *See id.* at 24, 88 S.Ct. 1868 (in the course of investigatory detention "it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to . . . neutralize the threat of physical harm"); *United States v. Becerra*, 97 F.3d 669, 671–72 (2d Cir.1996) (reasonable to suspect that "drug dealers commonly keep firearms on their premises as tools of the drug trade") (citations and internal quotation marks omitted); *see also United States v. Alexander*, 907 F.2d 269, 272 (2d Cir.1990) ("A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself . . . regardless of whether probable cause to arrest exists.").

*Terry* confirms that an investigatory stop entails "more than the governmental interest in investigating crime"; there is also the "more immediate interest" of "the neutralization of danger to the policeman in the investigative circumstance." 392 U.S. at 23, 26, 88 S.Ct. 1868. For this reason, it is well established that officers may ask (or force) a suspect to move as part of a lawful *Terry* stop. *See Halvorsen v. Baird*, 146 F.3d 680, 684–85 (9th Cir.1998) (officers handcuffed suspect and drove him to a nearby gas station for questioning); *United States v. Maher*, 145 F.3d 907, 908–09 (7th Cir.1998) (police moved a suspect from his home to his front yard in order to do a pat-down); *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (police asked suspect to return to site of possible narcotics transaction); *United States v. Blackman*, 66 F.3d 1572, 1576–77 (11th Cir.1995) (FBI agents surrounded apartment, ordered suspects to come out with hands up, and handcuffed them); *United States v. Tehrani*, 49 F.3d

54, 61–62 (2d Cir.1995) (traveler taken to small, private office). The officers acted reasonably under the circumstances to assure their own safety, the safety of the person delivering the food, and the safety of the occupants (one of them a child).

In terms of danger to the police and others, there is no appreciable difference between (i) a typical *Terry* encounter between officers and suspects that might occur in the hallway of an apartment building and (ii) the situation here, in which police standing in the hallway come face to face with the suspects through a door opened voluntarily by the suspects in response to a knock by an invitee. Because there is no principled basis for requiring probable cause and a warrant in the latter case but not the former, *Terry* must encompass this type of encounter and the police should have the authority to briefly question and frisk the suspects.

■ Finally, the investigative methods employed once the occupants were in the hallway were no more intrusive than the situation reasonably justified. Investigative methods reasonable under *Terry* are those "necessary to effectuate the purpose of the stop . . . [and] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500–01, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *id.* at 500, 103 S.Ct. 1319 ("The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case."). The purpose of the stop in this case was to verify or dispel the suspicion that Apartment 1M was being used as a stash house for narcotics and that one or more of the occupants might be involved

---

7. We do not consider whether police officers may knock on the door of a stash house and then justify an evacuation order on grounds of potential threat, or consider the lines of authority in other circuits accepting or rejecting the "knock and announce" exception to *Payton*. *Compare Berkowitz*, 927 F.2d at 1387 (suspect who answers door to officer's knock when he recognizes and submits to police authority relinquishes heightened privacy interest in the home), *with United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986) (suspect who answers knock of FBI agents but remains in the vestibule retains heightened protection). The danger to the police in this case resulted from an unanticipated turn of events, not any design of the police.

in the trafficking. Soon after the occupants were collected in the hallway, Det. Rodriguez asked two questions: who owned the apartment, and whether the owner knew Gori. Rosario immediately identified himself as the owner, privately disclosed to Rodriguez that Gori had paid him $1,000 "to hold a bag," and gave (and perhaps volunteered) consent to a search of the apartment before leading Det. Rodriguez to the armoire. We are unable to identify any unreasonable conduct on the part of Det. Rodriguez. "[T]he right to interrogate during a 'stop' is the essence of *Terry* and its progeny." *United States v. Oates*, 560 F.2d 45, 63 (2d Cir.1977); *see also Summers*, 452 U.S. at 700 n. 12, 101 S.Ct. 2587 (interrogation is " 'the most common' " of " 'several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop' " (quoting 3 Wayne R. LaFave, *Search and Seizure* § 9.2, at pp. 36–37 (1978))), and there is no evidence that Rosario's answers were "obtained by threat or in any way other than by voluntary consent." *Gori I*, 1999 WL 322651, at *9–*10. Det. Rodriguez's questions served the purpose of readily confirming or dispelling a reasonable suspicion, involved no more intrusion than necessary to accomplish the purposes of his investigation, and thereby fit comfortably within the limits authorized by *Terry*, 392 U.S. at 20–26, 88 S.Ct. 1868.

\*     \*     \*     \*     \*     \*

For these reasons, we conclude that the officers' conduct involved no more intrusion than necessary under a rapidly developing situation, and therefore satisfies the standard of "reasonableness in all the circumstances of the particular governmental invasion." *Terry*, 392 U.S. at 19, 88 S.Ct. 1868. The evidence seized and statements made in the course of that investigation therefore are not suppressible as tainted fruits of an illegal search or seizure in violation of the Fourth Amendment. The judgment of the district court on this ground is reversed.

## CONCLUSION

The district court's order suppressing evidence under the Fourth Amendment is reversed.

SOTOMAYOR, Circuit Judge, dissenting:

Today the majority takes the unprecedented step of holding that police officers do not violate the Fourth Amendment's protection of the home when they seize an individual standing inside his or her home without a warrant or applicable warrant exception and based only on reasonable suspicion that a crime is being committed therein. The majority reaches this extraordinary result by holding that the expectation of privacy of an individual standing dozens of feet inside his or her home with an open door is the same as that of an individual standing on a public street. *See ante* at 53. It purports to base this endorsement of police intrusion into the home on the Supreme Court's decision in *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), which it claims stands for the proposition that once the door of a home is opened, a home is no longer a home for constitutional purposes, *i.e.*, the special protections for homes set forth in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), do not apply. *See ante* at 53. The majority's reading of *Santana* is not only incorrect but is irreconcilable with decades of Supreme Court Fourth Amendment jurisprudence. Because I believe that the warrant and probable cause requirements for entry into a home set forth in *Payton* apply in this case, and that the officers had neither, I would affirm the district court. I therefore respectfully dissent.

## I.   Did the Heightened Protection of *Payton* Apply?

I agree with the majority's formulation of the critical issue in this case: whether the seizure violated the Fourth Amendment depends on whether the officers' or-

der to evacuate Apartment 1M triggered the heightened protection offered by *Payton* against warrantless entry into the home. *See ante* at 50.

The Fourth Amendment expressly protects "[t]he right of the people to be secure in their ... houses...." U.S. Const. amend. IV. The Supreme Court has recently re-emphasized that "the importance of the right to residential privacy is at the core of the Fourth Amendment." *Wilson v. Layne*, 526 U.S. 603, 612, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). As the Court explained in *Payton*:

> The Fourth Amendment protects the individual's privacy in a number of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms.... In terms that apply equally to seizures of property and to seizures of persons, *the Fourth Amendment has drawn a firm line at the entrance to the house.*

445 U.S. at 589–90, 100 S.Ct. 1371 (emphasis added). The home is protected against unnecessary government intrusion principally by the warrant requirement for searches and seizures within. *See Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). Thus, searches and seizures inside a home without a warrant and probable cause to support it are presumptively unreasonable. *See Payton*, 445 U.S. at 586, 100 S.Ct. 1371.

The majority's authorization of intrusions into the home without a warrant or warrant exception and based only on reasonable suspicion is predicated on two fundamental errors. First, the majority treats the occupants' expectations of privacy in Apartment 1M as an all-or-nothing proposition. According to the majority, voluntarily making yourself visible to a person standing in a public area is the same as making yourself available to be physically touched or otherwise seized.

However, the Supreme Court has made clear that individuals do not forfeit all privacy rights simply by placing themselves in public view.

In the seminal case of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), for example, the Supreme Court rejected the government's argument that a defendant had no expectation of privacy with respect to a telephone conversation he had in a glass-enclosed public telephone booth, holding that "what [defendant] sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen." 389 U.S. at 352, 88 S.Ct. 507. In distinguishing between the acceptable visual monitoring of the individual and his right to be free from invasions of the privacy that otherwise protected him while standing in the telephone booth, the Court explained that what an individual "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* Thus, I disagree with the majority that an open door translates into an "open season" on the individual inside.

The second flaw in the majority's reasoning is its confusion between situations in which the police obtain a warrant or gain probable cause to search or seize based on their observation of someone or something in public view and their simple right to do the observing. For instance, as the majority notes, *see ante* 50–51, courts have held that warrants and probable cause are not required for visual observations of persons or objects in plain view in homes if viewed by officers from public places, such as from an airplane above a home or from an apartment building yard through an open window. *See, e.g., Florida v. Riley*, 488 U.S. 445, 449–51, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (aerial observations of curtilage of home from helicopter); *United States v. Fields*, 113 F.3d 313, 321–22 (2d Cir.1997) (observations from apartment building yard through window

of home). However, that does not mean, as the majority today rules, that such observation alone justifies seizure of the observed persons or objects in the home. While plain view observations may permissibly form the basis for a warrant authorizing officers to enter the home to seize evidence or arrest suspects or for an applicable warrant exception, the plain view doctrine does not dispose of the probable cause and warrant requirements for the entry into the home itself. *See Coolidge v. New Hampshire,* 403 U.S. 443, 468, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ("[P]lain view alone is never enough to justify the warrantless seizure of evidence. .... [It] may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure."); *cf. Riley,* 488 U.S. at 449–51, 109 S.Ct. 693 (aerial observations permissibly served as basis of search warrant upon which drugs were seized and suspects arrested in curtilage of home); *Fields,* 113 F.3d at 321–23 (observations from apartment building sideyard through window permissible basis of probable cause and exigent circumstances excused warrant requirement for arrest of suspects and seizure of drugs in home).

The Supreme Court has also held that the plain view doctrine does not obviate the probable cause requirement for searches and seizures. Even if the police are inside an individual's home on the basis of a legal warrant, the Supreme Court has held that they cannot search or seize objects in plain view that are unrelated to the suspected crime that is the subject of the warrant without separate probable cause as to those items. *See Arizona v. Hicks,* 480 U.S. 321, 326–28, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). In finding that a police officer investigating a shooting violated the Fourth Amendment by physically moving stereo equipment he thought might be stolen in order to obtain the stereo's serial numbers, the court held that "[a] dwelling-place search, no less

than a dwelling-place seizure, requires probable cause, and there is no reason in theory or practically why application of the 'plain view doctrine' would supplant that requirement." *Id.* at 328, 107 S.Ct. 1149.

Applying the correct analytical framework to this case, I believe that, despite the voluntarily-opened door, defendants still had an expectation of privacy against government entry into their home and seizures of their persons. Certainly they had no expectation of privacy in what any individual could see or hear from the public hallway. If the officers, while standing outside the door, saw drugs or overheard incriminating statements, that evidence could permissibly form the probable cause basis for a warrant or lead them to determine that there were exigent circumstances excusing a warrant. However, that is distinct and separate from defendants' expectation that no one would invade the sanctity of their home without a warrant or warrant exception and probable cause, an expectation that I believe was reasonable in this case. Likewise, if police cannot seize objects in plain view without probable cause when they are already legitimately standing inside an individual's home, *see Hicks,* 480 U.S. at 326–28, 107 S.Ct. 1149, it is unclear why the Fourth Amendment would permit them both to enter the home from outside and to seize the object or person without probable cause, as the majority holds in this case.

*Santana* is consistent with my analysis of defendants' expectations of privacy in Apartment 1M as it respected, albeit just barely, the "firm line at the entrance to the house" drawn by *Payton,* 445 U.S. at 590, 100 S.Ct. 1371. The position of the defendant with respect to that "firm line," *id.,* far from being a "metaphysical subtlet[y]," *ante* at 54, was of prime importance in the Court's determination of whether the heightened protections of homes set forth in *Payton* apply, not whether the door was open or closed. When the police officers first saw Santana,

she was "standing directly in the doorway one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." *Santana,* 427 U.S. at 40 n. 1, 96 S.Ct. 2406. Although the officers had probable cause to arrest but no warrant, the Court held that at that point no warrant was required because Santana was in an area where she had no expectation of privacy at all. Santana "was *not merely visible to the public* but was exposed to public view, speech, hearing and *touch* as if she had been standing completely outside her house." *Id.* at 42, 96 S.Ct. 2406 (emphasis added). Thus, in order for the officers to seize, *i.e.* touch, Santana, they would not have had to cross the threshold of her home.

As the officers approached Santana, she retreated into her home. The officers then followed her through an open door and arrested her inside. *See id.* at 40, 96 S.Ct. 2406. At this stage, the Court did not say that no warrant was required because Santana's open door vitiated her expectation of privacy in her home. Rather, as the majority concedes, *see ante* at 52, the Court found that although the officers had probable cause, a warrant or applicable exception to the warrant requirement was still necessary. The Court found that the exigent circumstances of "hot pursuit" excused the warrant requirement. *Id.* at 42–43, 96 S.Ct. 2406.[1] Thus, the majority's position—that once a door of a home is open, the entire home becomes a public place—cannot be squared with the *Santana* decision itself.

The cases on which the majority relies for its broad interpretation of *Santana* are distinguishable. *See ante* at 52. Several of the cases involve defendants who were found to have consented to warrantless entries into their homes, and thus, the decisions were not based on a finding that a warrant was not required because the defendant was in a public place.[2] For example, in *United States v. Berkowitz,* 927 F.2d 1376 (7th Cir.1991), the court reversed the district court's denial of a defendant's suppression motion based on his warrantless arrest at the door of his home and remanded for a suppression hearing. *See Berkowitz,* 927 F.2d at 1385–1388. The court noted that if the facts were as the government claimed—the defendant *recognized and submitted to* the authority the police had asserted from outside his home—then the arrest would not violate the Fourth Amendment. *See id.* at 1389. However, the court observed that if the facts were as the defendant claimed—the police arrested defendant inside his home—the arrest would have violated *Payton's* warrant requirement. The court rejected the government's argument that *Santana* excused the warrant requirement under defendant's set of facts because his door was open and stated that the position of defendant in relation to the boundary of his home was the key factor: "*Payton* forbids any *non-consensual* warrantless entry into the home absent exigent circumstances. *Payton* did not draw the line one or two feet into the home; it *drew the line*

---

**1.** Unlike in *Santana,* and despite the majority's reference to the "exigencies of the moment," *ante* at 55, the government has never argued that exigent circumstances excused the warrant requirement or even that probable cause existed. *See United States v. Gori,* No. 98 CR 1163(RPP), 1999 WL 816172, at *1 n. 2 (S.D.N.Y. Oct.13, 1999) ("*Gori I* ").

**2.** The majority cannot reasonably characterize this case as one of consent. Defendants were unaware of the presence of the officers outside their door. Moreover, the unidentified "someone" from within Apartment 1M

answering the knock of the delivery person, *Gori I,* 1999 WL 322651, at *2, is totally different from an individual consenting to a warrantless entry by police officers into the apartment. *Accord United States v. Berkowitz,* 927 F.2d 1376, 1387 (7th Cir.1991) ("A person does not abandon this privacy interest in his home by opening his door from within to answer a knock. Answering a knock at the door is not an invitation to come in the house. We think society would recognize a person's right to choose to close his door on and exclude people he does not want within his home.").

*at the home's entrance."* *Id.* at 1388 (emphasis added).

Likewise, *United States v. Vaneaton,* 49 F.3d 1423 (9th Cir.1995), was a consent case where the police had probable cause to arrest the defendant but no warrant. In holding that the warrantless arrest of Vaneaton inside his home did not violate *Payton,* the court observed that "when Vaneaton saw [the uniformed police officers] through the window, he *voluntarily opened the door....*" *Id.* at 1427 (emphasis added). The court contrasted that to the violation that occurred in *Payton,* where "[w]ithout any behavior on [his] part that could be construed as *consent,* the police entered and arrested him on the spot." *Id.* at 1426 (emphasis added).[3]

Finally, this Court in *United States v. Crespo,* 834 F.2d 267 (2d Cir.1987), disapproved of the position the majority now adopts. *Crespo* involved the arrest of an individual that began at an open door to his home. *See Crespo,* 834 F.2d at 269–70. In determining whether the facts of defendant Crespo's case were such that *Santana* applied, this Court noted that "we have no precise finding as to Crespo's position" immediately prior to his arrest. *Id.* at 270. Because the defendant's position relative to the threshold of this home was unknown, the *Crespo* Court applied *Payton*'s warrant and probable cause requirements. This Court then found that there was probable cause for Crespo's arrest and that exigent circumstances excused the warrantless entry. *Id.* at 270–71.

The *Crespo* Court noted, albeit in *dicta,* that it "agree[d] in substance" with the New Hampshire Supreme Court's decision in *State v. Morse,* 125 N.H. 403, 480 A.2d

183 (1984). *Id.* at 270, 480 A.2d 183. The *Morse* court found *Santana* inapplicable to a warrantless arrest of a defendant standing inside the threshold of his open door, and the court distinguished *Santana* because that defendant was standing directly on the threshold of her door when the officers began to arrest her. *See Morse,* 480 A.2d at 184–85. In holding that the warrantless entry violated *Payton,* the *Morse* court stated "in the face of the [*Payton* ] Court's holding that the fourth amendment establishes a zone of privacy bounded by the *unambiguous physical dimensions of an individual's home,* it becomes very difficult to contend that *an individual located entirely within that boundary,* as was the defendant here, is in a public place." *Id.* at 186 (internal quotation marks and citations omitted) (emphasis added). I, like the *Crespo* Court, am persuaded by the *Morse* court's analysis.

Accordingly, because the occupants of Apartment 1M were within the boundaries of the apartment and had a reasonable expectation of privacy against government entry into the home, I would hold that the minimal requirements set forth in *Payton*—probable cause and a warrant or warrant exception-apply in this case.

## II. Did the Police Officers "Enter" Apartment 1M?

Having determined that the requirements of *Payton* are applicable in this case, there remains the question of whether the officers made a warrantless "entry" into Apartment 1M. The district court held that even if the police did not physically

---

3. The other two cases relied upon by the majority, *United States v. Carrion,* 809 F.2d 1120 (5th Cir.1987) and *United States v. Herring,* 582 F.2d 535 (10th Cir.1978), both hold that the defendants had no expectation of privacy at an open door of a home with little analysis and are distinguishable because the police had probable cause to arrest the defendants. *See Carrion,* 809 F.2d at 1128; *Herring,* 582 F.2d at 543. Additionally, *Herring* was decided before *Payton* and has been criti-

cized as inconsistent with the rule established by *Payton.* *See United States v. Morgan,* 743 F.2d 1158, 1165 (6th Cir.1984) ("[T]o the extent that the *Herring* court validates the warrantless arrest of an individual standing in the doorway of a private residence absent exigent circumstances, we believe the rule of *Payton v. New York,* would compel a contrary result had *Herring* been decided subsequent to the *Payton* decision.")

enter the apartment,[4] they made a warrantless constructive entry into the home in violation of *Payton* by "order[ing] the evacuation of the apartment while they stood outside the doorway with their shields displayed and their guns drawn." *Gori I,* 1999 WL 322651, at *8. I agree.

The occupants of Apartment 1M did not voluntarily choose to exit the apartment; they were ordered to do so by officers with drawn guns. With their show of authority from outside the door, the officers achieved the same result—forcing the occupants into the hallway—as they would have achieved had they crossed into the apartment and removed the occupants.[5]

Courts in other circuits have recognized that if the police could circumvent *Payton* simply by forcing the occupants of a home to step outside, *Payton*'s warrant and probable cause requirements would be meaningless. In *United States v. Johnson,* 626 F.2d 753 (9th Cir.1980), for example, the court held:

> In this case, we are confronted with the situation where the suspect was arrested as he stood inside his home and the officers stood outside his home with drawn weapons. In these circumstances, it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home. Otherwise, arresting officers could avoid illegal "entry" into a home simply by remaining outside the doorway and controlling the movements of suspects within through the

use of weapons that greatly extend the "reach" of the arresting officers.

626 F.2d at 757, *aff'd on other grounds,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982); *see also United States v. Maez,* 872 F.2d 1444, 1455 (10th Cir.1989) (holding *Payton* violated when "there is such a show of force that a defendant comes out of his home under coercion"); *United States v. Winsor,* 846 F.2d 1569, 1573–74 (9th Cir.1988) (en banc) (holding location of person arrested, and not officers, determines whether arrest occurs in home); *United States v. Morgan,* 743 F.2d 1158, 1166 (6th Cir.1984) (same); *Scott v. Henrich,* 700 F.Supp. 498, 504 (D.Mont.1988) (same); *United States v. Levasseur,* 699 F.Supp. 995, 999 (D.Mass.1988) (ordering occupants of home out at gunpoint "accomplishes much the same practical result ... as if the[ ] agents had entered the home"), *aff'd sub nom. United States v. Curzi,* 867 F.2d 36 (1st Cir.1989); *State v. Holeman,* 103 Wash.2d 426, 693 P.2d 89, 91 (1985) (en banc) (holding location of person arrested determines whether arrest occurs in home).

Because I find that the officers constructively entered Apartment 1M without a warrant or warrant exception, I would affirm the district court's holding that such an entry violated defendants' Fourth Amendment rights.[6]

## III. Are *Terry* Stops In the Home Permissible?

In my view, the majority's decision is particularly disturbing not only because a

---

4. The district court did not conclusively resolve the factual dispute of whether the officers entered the apartment to move the occupants out into the hall, which it noted would have been a "straightforward" violation of the Fourth Amendment. *Gori I,* 1999 WL 322651, at *8 n. 8.

5. The majority's characterization of the officers' behavior as "ask[ing] the occupants ... to step outside for the purposes of a limited investigation," *ante* at 55, fails to take into account the obvious element of coercion observed by the district court in its finding that "a reasonable person, confronted by two police officers who have their guns out of their

holsters and guns displayed, who identify themselves as police officers, and who order evacuation of the apartment, would not feel free to remain in the apartment of otherwise leave the scene." *See Gori I,* 1999 WL 322651, at *7.

6. I limit my discussion to the issue of whether the search and seizure of defendants violated the Fourth Amendment. I note that if the majority had found that the search and seizure violated the Fourth Amendment, it would have had to decide what evidence and statements, if any, should be excluded as fruits of the illegal search and seizure.

warrant was absent but because the officers also lacked probable cause to believe that a crime was being committed in Apartment 1M. In order to avoid dealing with this fatal flaw, the majority characterizes the entire encounter between the officers and the occupants of Apartment 1M as a *Terry* stop and investigation based upon reasonable suspicion. *See ante* at 53–54, 55–57. The majority's authorization of *Terry* stops and investigations of individuals within the boundaries of a home is an unprecedented expansion of *Terry*. *See LaLonde v. Riverside*, 204 F.3d 947, 954 (9th Cir.2000) (rejecting officers' "novel argument that their seizure of LaLonde should not be held to the standard of probable cause, but should instead be evaluated under the less onerous requirements of *Terry v. Ohio*," because "Supreme Court ... cases unequivocally hold that probable cause is a precondition for any warrantless entry to seize a person in his home.") (citing *Welsh*, 466 U.S. at 749–50, 104 S.Ct. 2091); *United States v. Johnson*, 170 F.3d 708, 714 (7th Cir.1999) ("No decision of the Supreme Court ... has ever held that the police may conduct a *Terry* 'frisk' of a house or an apartment—that is, approach it on nothing but a suspicion that something is amiss and conduct a brief warrantless search."). The majority's expansion of *Terry* into the home is also unsupported by the rationale for the creation of this limited exception to the probable cause requirement.

The Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), confronted the issue of whether the Fourth Amendment was violated when police officers stopped individuals on the street to ask questions and frisk for weapons, despite lacking probable cause to arrest them. *See Terry*, 392 U.S. at 15–16, 88 S.Ct. 1868. The Court emphasized that as a general rule, "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure" and "that in most instances failure to comply with the warrant requirement can only be excused by

exigent circumstances." *Id.* at 20, 88 S.Ct. 1868. The Court, however, recognized that street encounters between the police and citizens are distinct because they involve "an entire rubric of police conduct— necessarily swift action predicated upon the on-the-spot observations of the officers on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Id.* In recognizing the unique nature of these on-the-street encounters, the Court realized that there is a special need to investigate because the immediate potential for flight by the suspect. *Id.* at 20–25, 88 S.Ct. 1868. Thus, one primary rationale for allowing *Terry* stops and investigations is the evasive nature of the activities the police observe on the street.

The Supreme Court in *Terry* also justified that creation of the *Terry* exception on the ground that a stop and frisk involves a lesser intrusion than a full-blown arrest. *Id.* at 26, 88 S.Ct. 1868. "The *Terry* stop is a far more minimal intrusion [than an arrest], simply allowing the officer to briefly investigate further." *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 677, 145 L.Ed.2d 570 (2000). Supreme Court cases refining the scope of *Terry* stops and investigations have similarly focused on their minimally intrusive nature. *See, e.g., United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ("When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause."); *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) ("The narrow intrusions involved in" *Terry* and its progeny are not governed "by the general principle that Fourth Amendment seizures must be supported by the long-prevailing standards of probable cause, only because these intrusions f[a]ll far short of the kind of intrusion associated with an arrest.") (internal quotation marks and citations omitted).

In general, "the Supreme Court has defined a minimally intrusive seizure as one that occurs in public and is brief." *Winsor*, 846 F.2d at 1576 (citing *Terry*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 and *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).

Neither of these two rationales underlying *Terry* and its progeny apply to searches and seizures of individuals within the bounds of a home. The concerns facing officers on the beat are different than those facing officers observing a home. *See Lalonde v. Riverside*, 204 F.3d 947, 955 (9th Cir.2000) ("The reasons that gave rise to the rule in *Terry* are simply not applicable to a warrantless entry to seize a person within his home."); *United States v. McNeal*, 955 F.2d 1067, 1081 (6th Cir. 1992) (*Contie, C.J.* dissenting) (The majority is "attempt[ing] to transfer a doctrine developed in the context of police encounters with citizens in *public* places—the '*Terry* stop doctrine'—to a *private* residence.") (emphasis in original). Interactions between officers on the beat and suspects involve "necessarily swift action predicated upon the on-the-spot observations...." *Id.* at 20, 88 S.Ct. 1868. In contrast, officers who suspect illegal activity by occupants in a home have the luxury, as compared to street officers, of investigating until they have probable cause. They know a suspect's whereabouts by observing his exits and entrances from the home, while officers on the beat face the possibility that a suspect will have disappeared by the time they gather the additional information needed to have probable cause. The officers in this case were staked out at the apartment trying to confirm their suspicions by observing Apartment 1M.[7]

The second justification for *Terry*—the limited nature of the intrusion—seems absent almost by definition when the intrusion is in the home. Even almost two decades after the *Terry* exception was created and its scope expanded, the Supreme Court made clear in *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), that police should not be able to routinely search and seize objects in the home absent probable cause. As discussed earlier, *see supra* at 58–59, the Supreme Court in *Hicks* addressed the issue of whether police could, once permissibly within a home to investigate a crime, search an object in plain view that they had reasonable suspicion to believe was connected to an unrelated crime. Justice Scalia, writing for the majority, distinguished between an exception to the warrant requirement and allowing searches and seizures based on less than probable cause within a home once an officer is legitimately inside:

> Dispensing with the need for a warrant is worlds apart from permitting a lesser standard of cause for the seizure than a warrant would require, i.e., the standard of probable cause. No reason is apparent why an object should routinely be seizable on lesser grounds, during an unrelated search and seizure, than would have been needed to obtain a warrant for that same object if it had been known to be on the premises.

*Id.* at 327, 107 S.Ct. 1149.

Implicitly underlying the rationale in *Hicks* is a notion that no matter how limited the search or seizure within a home, the sanctity of the home is still invaded by the entry into the home itself. *Accord Winsor*, 846 F.2d at 1574 ("Because the expectation of privacy in one's home is that most jealously guarded by the Fourth Amendment, the Supreme Court has never suggested that a search of a home, however limited in scope, could ever be considered less than a major intrusion. In the absence of such authority, we follow *Hicks* in holding that no search of a dwelling may

---

**7.** The majority's discussion of the safety of the officers, *see ante* at 55–56, addresses the issue of whether a frisk for weapons was necessary once the defendants were seized. It does not, however, address the issue of whether the officers were justified in seizing the defendants in the first place, which is the threshold issue in this case.

be deemed a minor intrusion on Fourth Amendment rights."). I agree.

The majority's decision transforms the limited *Terry* exception into an exception that swallows the Fourth Amendment's warrant and probable cause requirements. Henceforth, police officers with only reasonable suspicion and no warrant need only wait outside the door of a home until the door happens to open, and, once it does, they can order the occupants out of their home and conduct a search and investigation in order to get the probable cause necessary for an arrest of a suspect or seizure of evidence.[8] Moreover, since according to the majority, the reason an open door eliminates *Payton*'s protections is that it makes a home's interior visible to the outside, its rule would logically also sanction officers with drawn guns ordering individuals from their home though an open window. In my view, if the Fourth Amendment's protection of "[t]he right of people to be secure in their ... houses" has any real meaning, such scenarios must be unconstitutional. U.S. Const. amend. IV.

## CONCLUSION

Where the home is concerned, the intrusive actions of police officers are "a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance." *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). For this reason, as Justice Scalia recognized in *Hicks*, officers investigating

inside homes have to follow up on their suspicions, if possible, by means other than an immediate search, although "[i]t may well be that, in such circumstances, no effective means short of a search exist. But there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Hicks*, 480 U.S. at 329, 107 S.Ct. 1149. I agree that the Fourth Amendment's protection of the home is worth such preservation. Accordingly, I respectfully dissent.

---

8. The majority faults the dissent for not suggesting what reasonable options the officers had under the circumstances and suggests that any option other than the one taken would have placed the officers in an emergency situation. *See ante* at 55. I agree that exigent circumstances are treated differently under the Fourth Amendment, but the Government has never argued that the officers faced exigent circumstances. *See Gori II*, 1999 WL 816172, at *1 n. 2. Thus, the issue before this Court is not what the police can do under emergency circumstances, but rather what the Fourth Amendment bars police

from doing as a matter of routine police procedure. Without a warrant or probable cause, the police cannot seize individuals in their home, even if that would be the most convenient investigative technique. As in every pre-warrant situation, the officers had a myriad of investigative techniques available to them that would have passed constitutional muster, such as staking out from afar or using informants. They chose not to use these. Their reasonable suspicion regarding the possibility of criminal conduct in the apartment did not give them the right to effect a forcible seizure of the persons within the apartment.