**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

          v.

GUNNER LAWSON CRAPSER,
              *Defendant-Appellant.*

No. 05-30456

D.C. No.
CR-03-00487-BR

OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued July 26, 2006;
Resubmitted January 3, 2007
Portland, Oregon

Filed January 10, 2007

Before: Alfred T. Goodwin, Stephen Reinhardt, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Reinhardt

## COUNSEL

Nancy Bergeson, Assistant Federal Public Defender, Portland, Oregon, for the defendant-appellant.

Frank Noonan, Assistant United States Attorney, Portland, Oregon, for the plaintiff-appellee.

## OPINION

GRABER, Circuit Judge:

Defendant Gunner Lawson Crapser appeals his conviction, upon a guilty plea, of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He argues that the trial court erred in denying his motion to suppress. We affirm because the initial encounter between Defendant and the police was consensual or, alternatively, was supported by reasonable suspicion, and because his consent to search was voluntary.

## FACTUAL AND PROCEDURAL BACKGROUND

The district court made extensive findings of fact, none of which is clearly erroneous and all of which are supported by evidence in the record. We therefore paraphrase the court's findings here.

In July 2003, Multnomah County Sheriff's Deputy Todd Shanks stopped a vehicle driven by William Barrett. In the course of the stop, he found a pressure-cooker in the trunk. Shanks suspected that the pressure-cooker had been used in the manufacture of methamphetamine. Barrett told Deputy Shanks that the pressure-cooker belonged to "Gunner Crapser," who was staying at an EconoLodge Motel in Gresham, Oregon, in a room registered to a white, female dancer named Summer Twilligear.

Shanks also learned that there was an outstanding arrest warrant for someone who used the name "Gunner Crapser." The warrant information, however, was flagged to warn officers not to confuse the wanted person, whose true name was James Stover, with anyone else who used the name "Gunner Crapser."

Shanks decided to go to the motel for two reasons. First, he intended to investigate whether the "Gunner Crapser" whom Barrett had described was the same man who was wanted. Second, Shanks intended to try to "knock and talk" his way into obtaining consent to search the room where Crapser was staying so as to look for evidence of methamphetamine activity. Shanks, who was in uniform and driving a marked patrol vehicle, asked for other officers to assist him at the motel. In the end, four uniformed officers and one plain-clothes officer were involved in the contact that led to Defendant's arrest.

The officers confirmed with the motel manager that Summer Twilligear rented Room 114. They then went to Room 114. Adjacent to an eight-foot-by-five-foot exterior concrete

entryway is a five-foot-wide sidewalk that runs alongside the motel rooms. Next to the sidewalk is the parking area for motel guests. Although a sign in the parking lot warns that parking is reserved for motel guests, the parking lot and the walkways leading to the doors of the motel rooms are open to public view and are accessible by anyone in the parking area.

When the officers arrived at about 11 a.m. on the day in question, they parked where they were not immediately visible from Room 114. Sergeant Edward Walls, who was in uniform, took a precautionary position at the rear of Room 114. There are no windows or doors on that side of the structure, so his presence was not obvious to the occupants of Room 114. Deputies Marc Galloway and Chad Phifer, who also were in uniform, and Deputy Scott Timms, who was in plain clothes, accompanied Shanks when he knocked on the door to Room 114. All of the uniformed officers had visible sidearms, and the plain-clothes officer had a concealed weapon. The police firearms, however, remained holstered at all times.

In response to Shanks' knock on the door of Room 114, a white woman, later identified as Twilligear, pulled back the curtains from inside the room and made eye contact with Shanks. Shanks asked Twilligear if she would open the door so that he could speak with her. She nodded in the affirmative and closed the curtains. About two minutes passed before she opened the door. While the officers waited, they heard what sounded like people moving things around inside the room. Nonetheless, the officers remained outside.

When the door opened, Twilligear and Defendant came out and closed the door behind them. This was the officers' first contact with Defendant. Shanks asked Galloway and Phifer to speak with Defendant to determine whether he was the person identified in the arrest warrant. The three of them moved a short distance away. In the meantime, Shanks and Timms spoke with Twilligear. The two groups stood 10 to 25 feet

from each other on the sidewalk near the parking area. During this initial part of the contact, the officers did not block or physically keep Defendant or Twilligear from walking away or returning to their room, nor did the officers affirmatively assert authority over the movements of Defendant or Twilligear.

Shanks asked Twilligear for identification. After obtaining her name and date of birth, he ran a records check and determined she was "clear." Shanks explained to Twilligear why the police had come to her motel room and asked who was renting the room. Twilligear told Shanks that she had rented the room and that Defendant had been there the night before. Twilligear said that other people also had been in and out of the room. Although Twilligear admitted she used methamphetamine, she denied that she was "cooking" any drugs and denied that there were any drug chemicals in the room. At this point, Shanks left Twilligear and Timms to join Galloway, Phifer, and Defendant while Timms continued to speak with Twilligear in the hope of obtaining her consent to search the room.

While Galloway and Phifer were speaking with Defendant about the warrant, they noticed that Defendant was very nervous and that his hands were shaking. Defendant's nervous demeanor contrasted sharply with his calm demeanor during a 20-minute traffic stop by these same officers about a week earlier. Defendant's behavior raised Galloway's suspicions. When Shanks joined the group a bit later, he, too, noticed that Defendant was very nervous; his hands were trembling and an artery was visibly pulsating in his neck.

Defendant explained to the officers that, in the past, he had been mistaken for another person who used the name "Gunner Crapser" and that there were no warrants outstanding for his arrest. Phifer left to run a computer check in his patrol vehicle. While Phifer was away and Defendant was talking with Galloway, Galloway asked Defendant something about drugs.

Defendant unexpectedly pulled a syringe from his right back pocket and said, "This is all I have on me." The syringe was capped and looked like the kind of syringe used by intravenous drug users. The cylinder contained a clear liquid that Galloway suspected was methamphetamine.

After Phifer confirmed that Defendant's physical characteristics did not match those of the wanted person, he returned from his patrol car and told Galloway that Defendant was "clear." But, by this time, Defendant had produced the syringe. Galloway patted him down to ensure that he had nothing on his person, other than the syringe, that could be used as a weapon. Shanks was present during the pat-down, which occurred about five minutes after Defendant emerged from Room 114.

Shanks confirmed with Defendant that he had stayed in Room 114 the previous night and that Twilligear was renting the room. Defendant said he had some personal property in the room. Shanks asked Defendant whether he would consent to a search of his person. Defendant answered "yes." Shanks then searched Defendant's pockets. In the right front pants pocket Shanks discovered a tissue-wrapped roll of three or four syringes and a small baggie containing what appeared to be methamphetamine. Shanks arrested Defendant for possession of a controlled substance, handcuffed him, and gave him the *Miranda* warnings. Shanks asked Defendant whether he understood his rights. Defendant answered "yes."

Shanks then told Defendant that he believed there might be a methamphetamine manufacturing operation in Room 114 and asked for Defendant's consent to search the room. At the same time, Timms was asking Twilligear for consent to search the room. Twilligear expressed concern that she not be held accountable for the content of Defendant's bags and said loudly, in Defendant's direction, that he should "own up" to what he had in the room. Defendant told Shanks that his blue adidas duffel bag contained a 9 mm handgun and a shotgun.

Specifically in response to Shanks' request for consent to search the room, Defendant said that he would consent. Shanks presented Defendant with a written consent form and read it, verbatim, to Defendant. Shanks also ascertained that Defendant had completed nine years of schooling. Defendant told Shanks that he understood the form, and he signed it. The consent form identified the location and gave permission to search the room and the blue adidas duffel bag for evidence of controlled substance and firearms offenses. Twilligear signed a similar form consenting to the search of Room 114. The resulting search turned up the firearms that are the subject of this case.

In October 2003, the grand jury returned a three-count indictment. Defendant filed a motion to suppress, asserting that the officers had violated the Fourth Amendment when they detained him because they did not have a reasonable suspicion to seize him, search him, pat him down, or search his motel room. The district court held an evidentiary hearing and denied the motion. Defendant pleaded guilty to the illegal firearm count in the indictment in exchange for dismissal of the other counts. He reserved the right to appeal the district court's rulings on his motion to suppress. This timely appeal followed.

## STANDARDS OF REVIEW

We review de novo the denial of a motion to suppress evidence, *United States v. Bautista*, 362 F.3d 584, 588-89 (9th Cir. 2004), but review for clear error the district court's underlying findings of fact, *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004). Whether an encounter between law enforcement officers and a defendant amounts to a seizure is a mixed question of law and fact that we review de novo. *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997). Likewise, we review de novo whether a seizure was supported by reasonable suspicion. *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002). Finally, we

review for clear error a district court's finding that the defendant voluntarily consented to a search. *United States v. Pang*, 362 F.3d 1187, 1191 (9th Cir. 2004).

## DISCUSSION

### A. *The initial contact with Defendant was consensual.*

The first question that we must answer is whether the initial conversation with Defendant was a seizure or, instead, was voluntary and consensual. We hold that the district court properly concluded that the encounter was voluntary and consensual, not amounting to a seizure.

This situation bears a strong resemblance to the encounter that we described in *United States v. Cormier*, 220 F.3d 1103 (9th Cir. 2000). There, Officer Peters went to Cormier's motel room, knocked, and asked to come in and speak with him. After asking him some questions, Peters asked if she could look around, and Cormier assented. She found a gun and placed Cormier under arrest. *Id.* at 1107. Because Cormier had a reasonable expectation of privacy in his motel room, we analyzed "whether he voluntarily opened the door or, alternatively, whether there were coercive circumstances that turned an ordinary consensual encounter into one requiring objective suspicion." *Id.* at 1109. Citing *Davis v. United States*, 327 F.2d 301, 303-04 (9th Cir. 1964), we held:

> **[1]** This Court stated the general rule regarding "knock and talk" encounters almost forty years ago in the following passage:
>
>> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably,

at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis*, 327 F.2d at 303. That view has now become a firmly-rooted notion in Fourth Amendment jurisprudence. *See* [*United States v.*] *Jerez*, 108 F.3d [684, 691 (7th Cir. 1997)]; *United States v. Taylor*, 90 F.3d 903, 909 (4th Cir. 1996); *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991); *United States v. Roberts*, 747 F.2d 537, 543 (9th Cir. 1984). The facts of this case fall under the general rule of *Davis*. Here, Peters knocked on the door for only a short period spanning seconds. In addition, Peters never announced that she was a police officer while knocking nor did she ever compel Cormier to open the door under the badge of authority. Because there was no police demand to open the door, *see United States v. Winsor*, 846 F.2d 1569, 1573 n.3 (9th Cir. 1988) (en banc), and Peters was not unreasonably persistent in her attempt to obtain access to Cormier's motel room, *see Jerez*, 108 F.3d at 691-92, there is no evidence to indicate that the encounter was anything other than consensual. Therefore, no suspicion needed to be shown in order to justify the "knock and talk." *See Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991).

*Cormier*, 220 F.3d at 1109.

**[2]** Here, similarly, there was a single, polite knock on the door. The police did not demand that Twilligear open the door; they asked, she nodded an affirmative response, and the police waited patiently and silently for her to decide that she (and Defendant, as it turned out) were ready to come outside

about two minutes later. Although the officers were armed, they made no effort to draw Defendant's attention to their weapons, nor did they use any form of physical force. The police made no effort to enter the motel room. The encounter occurred in the middle of the day, on a sidewalk in public view. The entire event, up to the time Defendant produced the syringe, lasted about five minutes. Although there were four officers present, most of the time only two talked to Defendant, while two talked to Twilligear, and part of the time only Galloway was with Defendant. The police did not block Defendant or Twilligear, suggest that they could not leave or return to their room, give them orders, or affirmatively assert authority over their movements.

It also is instructive to contrast this case with *Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994), in which we found a seizure instead of a consensual encounter. There, the officers positioned themselves so as to be certain the defendant could not escape or leave, the officers made a deliberate effort to reveal their concealed firearms; the encounter occurred in a non-public setting, and the officers acted in an aggressive manner suggesting that compliance would be compelled. The ratio of officers to defendants was 4 to 1. *Id.* at 491; *see also United States v. Washington*, 387 F.3d 1060, 1068-69 (9th Cir. 2004) (holding that an encounter was not consensual where it occurred in a private place, the officers refused to honor the defendant's request to shut the door, and the officers advised the defendant several times that he could be arrested and told him he could not terminate the encounter).

**[3]** In short, we hold that the "knock and talk" resulted in a voluntary, consensual encounter between Defendant and the police outside Room 114.

B.    *Even if Defendant was seized, the police had reasonable suspicion to stop him.*

**[4]** Even if the initial encounter was a seizure, it was a *Terry* stop supported by reasonable suspicion. *See Terry v.*

*Ohio*, 392 U.S. 1, 27 (1968) (explaining that, in determining whether an officer had reasonable suspicion, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience"). Reasonable suspicion is less than probable cause; "[i]t is merely 'a particularized and objective basis' for suspecting the person stopped of criminal activity." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000) (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)).

**[5]** First, the police had a reasonable suspicion that Defendant was the Gunner Crapser for whom they had an outstanding warrant, until Phifer completed the computer check in his patrol car. Accordingly, it was permissible to detain him in order to resolve questions about his identity. *See United States v. Christian*, 356 F.3d 1103, 1106 (9th Cir. 2004) (upholding a *Terry* stop to determine a suspect's identity).

**[6]** Second, the police had a reasonable suspicion that Defendant was engaged in the manufacture of methamphetamine. By the time Galloway asked Defendant a question about drugs, the police knew four significant facts: (1) Defendant displayed extremely nervous behavior, in contrast to his behavior a week earlier when the same officers had stopped him for another reason; (2) Barrett, upon being arrested, had said that the pressure-cooker found in the trunk of his vehicle belonged to Gunner Crapser, and a pressure-cooker could be used in methamphetamine production; (3) Twilligear admitted to being a methamphetamine user and told police that other people had come and gone from Room 114 the previous night; and (4) between the time Twilligear nodded her assent to talk to Shanks and the time she and Defendant emerged, two minutes elapsed, during which the police heard the sounds of people moving things around the room. These facts, taken together, were enough to permit a reasonable officer to suspect that criminal activity was afoot. Additionally, although Defendant had explained that he was not the same

Gunner Crapser for whom the arrest warrant had been issued, the police had not yet confirmed that fact and still reasonably suspected that he *might* be the wanted person.

[7] Although the dissent is correct that nervousness, possession of a pressure-cooker, staying in a motel room with a person using methamphetamine, and taking a few minutes to open the door are each, by themselves, not necessarily indicative of criminal behavior, all of these facts together are. In *United States v. Arvizu*, 534 U.S. 266, 273-75 (2002), the Supreme Court emphasized that reviewing courts must consider the *totality* of the circumstances in determining whether officers had reasonable suspicion to conduct a *Terry* stop. There the court of appeals rejected the facts identified by the officer as contributing to his suspicion because they were readily susceptible to innocent explanations, but the Supreme Court admonished that *Terry* "precludes this sort of divide-and-conquer analysis." *Id.* at 274; *see also United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir. 1992) (stating that "the facts used to establish reasonable suspicion need not be inconsistent with innocence" (internal quotation marks omitted)). Following *Arvizu*'s guidance, in view of all the circumstances known to the officers, we conclude that the initial encounter with Defendant, if a stop, was supported by reasonable suspicion.

[8] Defendant responds that, even if reasonable suspicion existed, a *Terry* stop cannot occur "at" a person's residence. We disagree. Although we have not squarely considered this issue before, we have held that police may make a warrantless arrest of a suspect who voluntarily opens the door to his residence in response to a knock by the police. *United States v. Vaneaton*, 49 F.3d 1423, 1426-27 (9th Cir. 1995). In *Vaneaton*, the defendant argued that his arrest violated the rule of *Payton v. New York*, 445 U.S. 573 (1980), that police must have a warrant in order to arrest a suspect inside his home. 49 F.3d at 1424. We reasoned that, where officers use no force, threats, or subterfuge, a suspect's decision to open the door

exposes him to a public place, and the privacy interests protected by *Payton* are not violated. *Id.* at 1427.

**[9]** Likewise, we now hold that when a suspect voluntarily opens the door of his residence in response to a non-coercive "knock and talk" request, the police may temporarily seize the suspect outside the home (or at the threshold) provided that they have reasonable suspicion of criminal activity. If an arrest in the doorway is allowed, certainly the lesser intrusion of a *Terry* stop in the hallway is also permissible.

In *United States v. Gori*, 230 F.3d 44 (2d Cir. 2000), the Second Circuit, using similar reasoning, held that police who ordered occupants of an apartment to step into the hallway, and who seized them there based on reasonable suspicion, did not violate the Fourth Amendment. Although there was no warrant, and probable cause had not yet developed, the *Gori* court relied on *Terry* and *United States v. Santana*, 427 U.S. 38 (1976), for this holding. In *Santana*, the police were 15 feet from the suspect's house when they saw her standing in the doorway; when she retreated into the vestibule, the officers followed her through the open door and arrested her. *Id.* at 40. The Supreme Court upheld the conviction. In *Gori*, the Second Circuit held:

> The defendants argue that reasonable suspicion is not enough because the *Santana* exception to *Payton* is limited to circumstances in which officers have probable cause to arrest a suspect exposed to public view. We see no basis for that limitation. The *Santana* analysis, which supports the warrantless *arrest* of a suspect who has no legitimate expectation of privacy, *a fortiori* allows the lesser intrusion of a brief investigatory detention. *See Illinois v. Wardlow*, 528 U.S. 119 (2000) (investigatory detention "is a far more minimal intrusion" than arrest); *United States v. Place*, 462 U.S. 696, 705 (1983) (same).

230 F.3d at 53.

**[10]** Our cases establish that *Terry* does not apply *inside* a home. *See United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005) ("Certainly, the usual rules pertaining to *Terry* stops do not apply in homes."); *United States v. Winsor*, 846 F.2d 1569, 1577-78 (9th Cir. 1988) (en banc) (declining to apply *Terry*'s reasonable suspicion standard to a warrantless search in a home). *But see United States v. Flippin*, 924 F.2d 163, 165-66 (9th Cir. 1991) (holding that, after police entered a motel room with the suspect's consent, it was permissible to seize and search a make-up bag held by the suspect based on mere reasonable suspicion that it contained a weapon). There is a critical difference, however, between the inside of a home and the outer threshold and beyond, as recognized in *Santana*. That difference is the suspect's expectation of privacy. When Defendant opened the motel room door and came outside, he surrendered his heightened expectation of privacy and the Fourth Amendment protections that go along with it —including the right not to be detained based on reasonable suspicion.

**[11]** In sum, we hold that, if Defendant was seized, the seizure was a permissible *Terry* stop supported by reasonable suspicion.

C. *Defendant's consent to search his person, motel room, and duffel bag was voluntary.*

The only remaining question is whether Defendant's oral and written consent to search was voluntarily given. We consider five factors in determining the voluntariness of a consensual search: "(1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could

be obtained." *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002).

**[12]** The district court found that Defendant was in custody when he consented to the search, and the government concedes that point. Nonetheless, "[a] person in custody is capable of giving valid consent to search." *United States v. Lindsey*, 877 F.2d 777, 783 (9th Cir. 1989). The remaining factors all militate in favor of voluntariness: The officers did not have their weapons drawn, Defendant was given *Miranda* warnings and was told that he had the right to refuse consent, and Defendant was not told that a search warrant would or could be obtained if he refused consent.

**[13]** Accordingly, we hold that the district court's finding that Defendant knowingly and voluntarily consented to the search was not clearly erroneous.

AFFIRMED.

---

REINHARDT, Circuit Judge, dissenting:

The majority opinion further weakens our Fourth Amendment protections — whatever is left of them. Specifically, I disagree, first, with the majority's holding that Crapser's initial contact with police was consensual. Our holdings in *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) and *Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994) require a contrary result. I likewise disagree with the majority's alternative holding that, if a seizure occurred, the officers possessed the requisite suspicion necessary to interrogate Crapser about his potential involvement in drug activity. None of the factors relied upon by the majority to find reasonable suspicion is sufficient to do so, either alone or in the aggregate. Finally, because Crapser was illegally seized, his consent to the search of the room was invalid, and his motion

to suppress should have been granted. Because of those conclusions, I would continue to reserve judgment on whether, even if reasonable suspicion exists, a *Terry* stop may occur under the circumstances present here. *See Washington,* 387 F.3d at 1067-68.

## I.  *Crapser was seized when he exited the motel room.*

"It is well settled that '[t]he Fourth Amendment protection against unreasonable searches and seizures is not limited to one's home, but also extends to such places as hotel or motel rooms.' " *United States v. Bautista,* 362 F.3d 584, 589 (9th Cir. 2004) (quoting *United States v. Cromier,* 220 F.3d 1103, 1108-09 (9th Cir. 2000)). Where, as here, police conduct a "knock and talk" at a person's motel room, "the question is whether he voluntarily opened the door or, alternatively, whether there were coercive circumstances that turned an ordinary consensual encounter into one requiring objective suspicion." *Cromier,* 220 F.3d at 1109. In general, it is not "illegal per se, or a condemned invasion of the person's right of privacy, for anyone to . . . knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant." *Id.* (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964)). However, an otherwise permissible "knock and talk" becomes a seizure requiring reasonable suspicion where a law enforcement officer, "through coercion, 'physical force[,] *or a show of authority*, in some way restricts the liberty of a person.' " *Washington,* 387 F.3d at 1068 (quoting *United States v. Chan-Jimenez*, 125 F.3d 1324, 1325 (9th Cir. 1997)) (emphasis added).

In *Orhorhaghe*, we identified five factors that aid in determining whether a reasonable person approached by police officers at his residence would have believed that he was "at liberty to ignore the police presence and to go about his business." 38 F.3d at 494 (quoting *Florida v. Bostick* 501 U.S. 429, 437 (1991)). These factors are: (1) the number of officers involved; (2) whether the officers' weapons were displayed;

(3) whether the encounter occurred in a public or non-public setting; (4) whether the officers' officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter. *Washington*, 387 F.3d at 1068 (citing *Orhorhaghe,* 38 F.3d at 494-96).

Examining Crapser's initial encounter with the officers in light of these factors, there can be little doubt that he was seized. When Crapser exited the room he was confronted by four police officers, three of whom were in uniform and visibly carrying weapons. The encounter occurred on private property in a location partially shielded from public view. The officers acted in a manner that suggested compliance would be compelled, separating Crapser and his companion, interrogating them, and never informing them that they had the right to terminate the encounter.

The majority disregards these facts and fails to undertake the requisite analysis under *Orhorhaghe,* instead merely listing various factors it believes demonstrate that the encounter was voluntary. In so doing, it both misinterprets our case law and ignores controlling Ninth Circuit precedent.

First, the majority concludes that the fact that the officers were carrying visible weapons is immaterial because they "made no effort to draw the Defendant's attention to their weapons." Maj. Op. at 169. Thus, the majority appears to be under the impression that in order to find that "weapons were displayed" under the second *Orhorhaghe* factor, officers must actually draw or draw attention to their weapons. This conclusion is erroneous under *Washington* and *Orhorhaghe.* In *Washington* we held that the fact that "Washington was confronted by six officers, five of whom were in uniform and *visibly carrying weapons* . . .*" weighed against a finding of voluntariness, even though none of the officers drew their weapons or otherwise drew attention to them. 387 F.3d at 1068. Similarly, in *Orhorhaghe* we held that the fact that the

defendant saw that a plain-clothes officer was carrying a weapon when he had placed his hand on his hip weighed against a finding of voluntariness, notwithstanding the fact that the gesture was not intended to draw the defendant's attention to the weapon. 38 F.3d at 495. Accordingly, the majority's contention that the fact that the officers were visibly carrying weapons does not militate against a finding of voluntariness is erroneous in light of controlling circuit law.

Second, the majority errs in finding that the setting in which the encounter occurred weighs in favor of a finding of voluntariness. Maj. Op. at 169. Specifically, the majority's characterization of the setting as "a sidewalk in public view" is belied by the record. As the district court noted, the incident occurred on private property, on a walkway between motel rooms and a parking area in which "a sign . . . warns that parking is reserved for motel guests." Moreover, testimony at the suppression hearing described the area as set far back from the street and somewhat shielded from view by a set of stairs up to the second floor. Accordingly, while the location in which the encounter took place may not weigh as strongly against a finding of voluntariness as it would have had it occurred in a narrow enclosed hallway "shielded from the view of the vast majority of the public," *Washington*, 387 F.3d at 1068, contrary to the majority's contention, it nevertheless tends to support a finding of lack of voluntariness.

Third, the majority ignores the extent to which the officers' conduct and manner "indicated that compliance would be compelled." *Washington*, 387 F.3d at 1068. When Crapser and Twilligear emerged from the motel room, they were confronted by numerous uniformed and armed police officers. The officers then separated Crapser from Twilligear for questioning and directed Crapser to accompany two officers to a location 25 to 30 feet from where Twilligear was being questioned. Even after Crapser told the officers that he was not the subject of any warrants and that he had been confused with someone who had used the alias "Gunner Crapser" in the past,

the officers did not indicate that he was free to go. To the contrary, Officer Galloway candidly testified that Crapser was *not* free to terminate the encounter while Officer Phifer checked on the identifying information contained in the warrant. Thus, this factor likewise weighs in favor of a finding that the encounter was nonconsensual and that Crapser was seized. In fact, all five *Orhorhaghe* factors support such a result.[1]

Not only does the majority fail to analyze the encounter in light of the *Orhorhaghe* factors, and to misapply the factors it does mention, its conclusion that Crapser was not seized conflicts with our holding in *Washington*, 387 F.3d 1060. There, we held that the defendant had been unlawfully seized in violation of the Fourth Amendment during an encounter with police outside his room in a residential motel. *Id.* at 1069. As here, police believed that Washington was operating a methamphetamine lab inside his room, and several officers went to Washington's room to conduct a knock and talk. *Id.* at 1063. When Washington emerged in response to the knock, he "was confronted by six officers, five of whom were uniformed and visibly carrying weapons." *Id.* at 1068. Police then began to question him in the "hallway of his apartment building — private property shielded from view of the vast majority of the public." *Id.* The officers moved Washington 20 to 30 feet away, and refused to heed his request to shut the door to his residence. *Id.* at 1069. One of the officers reminded Washington several times that his failure to register with the Reno Police Department after being arrested for carrying a concealed weapon was an arrestable offence, and that he would be arrested if he did not cooperate. *Id.* At no point during the interaction did the officers notify Washington that he had the right not to answer their questions or that he could

---

[1] In addition to the three factors discussed separately in the text the two others, the number of officers dispatched to conduct the investigation of Crapser and their failure to advise him of his right to terminate the encounter also support a conclusion that the encounter was nonconsensual.

terminate the encounter at any time. *Id.* Analyzing this encounter under the *Orhorhaghe* factors, we held that Washington had been seized within the meaning of the Fourth Amendment because, "[t]aking into account all of these circumstances . . . [a] reasonable person in [Washington's] position would not have felt 'at liberty to ignore police presence and go about his business.' " *Id.* (quoting *Orhorhaghe*, 38 F.3d at 494).

Though the facts of *Washington* are not totally analogous to those presented here, there are several distinct similarities, including the number of officers involved, the moving of the defendant to a location 20 to 30 feet from the door of the motel room, the officious manner of the officers, their visible carrying of weapons, and the fact that the officers never indicated the defendant was free to terminate the encounter.

The majority fails to analyze the facts of the case before us in light of *Washington*, instead concluding that this case is controlled by *United States v. Cromier*, 220 F.3d 1103 (9th Cir. 2000). Maj. Op. at 167-69. In *Cromier,* police learned that the defendant, who was a registered sex offender with an extensive criminal history, was staying at a motel located in a high-crime area. *Id.* at 1106-07. A female police officer, Officer Peters, decided to conduct a "knock and talk" interview with Cromier in order to determine whether he was currently involved in any criminal activity. *Id.* at 1107. Peters, who was alone and wearing plain clothes, knocked on the door to Cromier's room. *Id.* When he answered, she identified herself as a police officer and "asked if she could speak with him inside his room so that other motel occupants would not overhear their conversation." *Id.* Cromier allowed Peters to enter his room and, when she asked if she could question him, he said that she could. *Id.* Peters then asked if she could look around and Cromier said "go ahead." *Id.* Peters soon discovered a gun in the pocket of a jacket hanging in his closet. *Id.* We rejected Cromier's argument that he had been seized at the time he allowed Peters to enter his motel room because he

had been confronted by only a single officer in plain clothes and the officer neither displayed a weapon nor spoke to Cromier in an authoritative tone. *Id.* at 1110. Moreover, Cromier failed to present evidence that he had tried to terminate the encounter, and there was no testimony that suggested that Cromier was "not at liberty to ignore the police presence and go about his business." *Id.* (quoting *Florida v. Bostick,* 501 U.S. 429, 437 (1991)).

While neither *Washington* nor *Cromier* present facts that are identical to those before us, the facts in *Washington* are clearly far more analogous. Indeed, the *only* similarity between the facts of *Cromier* and the facts here is that the officers did not, in either case, advise the individual in question of his right to terminate the encounter with the police, which is true of *Washington* as well. In all other respects, the *Cromier* police conduct was not only materially different from that in *Washington* and in the case before us but it completely failed to meet the *Ohorhaghe* standards as well. Thus, the majority's conclusion that Crapser's initial encounter with the officers was voluntary is erroneous in light of our holding in *Washington* and the fact that here all five of the *Orhorhaghe* factors weigh against a finding of voluntariness. Indeed, looking at the totality of the circumstances, it is clear that the established law of this Circuit requires the common-sense conclusion that a reasonable person in Crapser's position would not have felt "at liberty to ignore the police presence and to go about his business," *Orhorhaghe,* 38 F.3d at 494 (quoting *Bostick*, 501 U.S. at 437); thus, even prior to Crapser's production of the syringe, he was seized within the meaning of the Fourth Amendment. *Id.*

II.  *The officers did not possess reasonable suspicion to question Crapser about drug activity.*

Because Crapser was seized, all evidence obtained as a result of the seizure must be excluded unless the police had reasonable suspicion to detain and question him. *Terry v.*

*Ohio,* 392 U.S. 1, 27 (1968). Although I agree with the majority that the officers possessed the requisite suspicion to question Crapser as to whether he was the person named in the warrant for James Stover a.k.a. "Gunner Crapser," I dissent from its holding that the officers had reasonable suspicion to question him about drug activity, the event from which the seizure of the evidence here at issue flowed.

The scope of an investigative detention "must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). During a *Terry* stop, a police officer may only "ask questions that are reasonably related in scope to the justification for his initiation of contact." *United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001); *see also United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001) ("An officer must initially restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop."). An officer may expand the scope of questioning beyond the initial purpose of the stop only if he "articulate[s] suspicious factors that are particularized and objective." *Murillo*, 255 F.3d at 1174; *see also Chavez-Valenzuela*, 268 F.3d at 724 (stating that an officer may expand scope of questioning "*only if* he notices particularized, objective factors arousing his suspicion" (emphasis added)); *United States v. Perez*, 37 F.3d 510, 513 (9th Cir. 1994) (same).

The officers' reasonable suspicion as to whether Crapser was the object of the warrant did not provide reasonable suspicion as to his involvement in drug activity, or allow for questioning on that subject. There is no evidence in the record indicating that the warrant was for a drug-related offense or for anything more serious than a traffic violation. Although we do not know the precise questions asked by Officer Galloway prior to Crapser's production of the syringe, the district court found that they related to drugs. As such, this interrogation was permissible only if there were particularized, objective factors that justified an expansion of the scope of the

inquiry from Crapser's identity vis-a-vis the Crapser warrant to the subject of narcotics. *See United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001).

The majority holds that Officer Galloway had the requisite suspicion to question Crapser about his involvement in drug activity because

> (1) Defendant displayed extremely nervous behavior, in contrast to his behavior a week earlier when the same officers had stopped him for another reason; (2) Barrett, upon being arrested, had said that the pressure-cooker in the trunk of his vehicle belonged to Gunner Crapser, and a pressure-cooker could be used in methamphetamine production; (3) Twilligear admitted to being a methamphetamine user and told police that other people had come and gone from Room 114 the previous night; and (4) between the time Twilligear nodded her assent to talk to Shanks and the time she and Defendant emerged, two minutes elapsed, during which the police heard the sounds of people moving things around the room.

Maj. Op. at 170. This holding is erroneous. First, Twilligear's statements regarding her own methamphetamine use and the coming and goings from Room 114 cannot support a finding of reasonable suspicion, if only because they were not known to Officer Galloway at the time he questioned Crapser about drug activity. Second, the remaining factors — viewed individually and in the aggregate — were insufficient to provide Galloway with reasonable suspicion that Crapser was involved in drug activity.

As noted, Officer Galloway was unaware that Twilligear had admitted to using methamphetamine at the time he questioned Crapser about his involvement in drug activity. Crapser and Twilligear were questioned simultaneously by different

officers and were separated by 25-30 feet.[2] Officer Shanks, to whom Twilligear admitted using methamphetamine, did not join Crapser and Galloway until *after* Galloway had questioned Crapser about drugs and Crapser had produced the syringe.[3] Accordingly, Galloway did not know of Twilligear's admission at the time he questioned Crapser about drug activ-

---

[2]The majority states that Crapser and Twilligear, along with the officers questioning them were separated by 10-25 feet. However, Officer Shanks testified that the distance between the two groups was 25-30 feet.

[3]Indeed, the district court found that Shanks did not approach Crapser and Galloway until after Galloway questioned Crapser about his involvement in drug activity. Specifically, it found that, after Crapser and Twilligear exited the motel room

> Deputy Shanks asked Deputies Galloway and Phifer to speak with Defendant to determine whether he was the person identified in the arrest warrant. The three of them moved a short distance away. In the meantime, Deputies Shanks and Timms spoke with Twilligear. . . . Deputy Phifer left Deputy Galloway and Defendant and ran a computer check [on the warrant] in his patrol vehicle. While Deputy Phifer was away and Defendant and Deputy Galloway were talking, Defendant unexpectedly pulled a syringe from his right back pocket and said to Deputy Galloway, "This is all I have on me." . . . [T]he Court concluded it is likely Deputy Galloway asked Defendant something about drugs before Defendant produced the syringe. . . . After Deputy Phifer confirmed that Defendant's physical description (including tattoos) did not match the wanted person, Deputy Phifer returned from his patrol car and told Deputy Galloway that Defendant was "clear." . . . Deputy Galloway decided to "pat-down" the defendant to ensure he did not have anything besides the syringe on his person that could be used as a weapon. Deputy Galloway found nothing of concern during the pat-down. . . . About this time, which was approximately five minutes after Defendant and Twilligear first came out of Room 114, Deputy Shanks joined Deputy Galloway, Deputy Phifer and Defedant. Deputy Shanks learned about the syringe and was present during the pat-down.

Thus, the district court's findings of fact make clear that, at the time Galloway asked Crapser "something about drugs," Shanks had not yet informed him of Twilligear's statements with respect to her drug use and the comings and goings from Room 114.

ity, and it therefore cannot be used to support reasonable suspicion.

At the time that Galloway interrogated Crapser, the only factors that could have provided him with reasonable suspicion that Crapser was involved in drug activity were the (1) pressure cooker found in Barrett's car, which Barrett stated belonged to Crapser, (2) the two minutes that transpired between the time that the officers knocked on the door to the motel room and when Crapser and Twilligear emerged, and (3) Crapser's nervousness when confronted by a group of armed police officers.[4] The pressure cooker cannot provide any basis for reasonable suspicion absent some evidence of drug activity. A pressure cooker is a common, legal kitchen appliance, most often used to cook foods such as beans, rice, and barley. There is no indication in the record that the pressure cooker contained drug residue or any other characteristics that would suggest that it had ever been used for unlawful purposes. Nor is there anything in the record connecting Barrett to drug activity.[5] Thus, Barrett's possession of the pressure cooker that he told the officers was owned by Crapser adds nothing to the equation.

Similarly, neither the two minutes that transpired between

---

[4]The warrant provides no basis for reasonable suspicion of narcotics activity. Although at the time of the questioning the officers had not definitively established that Crapser was not the person named in the warrant, they were aware that he likely was not that person because Crapser did not match the physical description in the warrant and the warrant specifically warned officers that there might be more than one person using the name "Gunner Crapser." Moreover, as noted above, even if the officers believed that Crapser was the person described in the warrant, the warrant does not provide reasonable suspicion of drug activity because there is no indication that the warrant related to a drug related crime.

[5]Barrett was arrested during a traffic stop because there was an outstanding warrant for his arrest. The record does not reveal what that warrant was for or whether anything, besides the pressure cooker, was found in Barrett's car.

the time the officers knocked on the door of Twilligear's motel room and the time she and Crapser emerged, nor the fact the officers heard people moving about the room, suggests that anyone was involved in drug activity. Nothing in the record suggests that either Crapser or Twilligear was doing anything other than simply getting out of bed and putting on clothes or straightening up before opening the door. Accordingly, the two minute period, alone or in conjunction with the other facts pointed to by the majority, does not give rise to reasonable suspicion. In fact, Twilligear indicated to the officers, shortly after they knocked, that she would open the door so that they could speak with her. (At this point, the police had not suggested that Crapser rather than she was the object of their inquiry.) That it took Summer Twilligear, an exotic dancer, two minutes to get ready to make a public appearance for an interview is hardly a suspicious circumstance.

Nor did Crapser's apparent nervousness, by itself or in combination with the pressure cooker and Twilligear's two minute delay before opening her motel room door, provide reasonable suspicion that Crapser was involved in drug activity. Nervousness upon being approached, detained, and questioned by a group of visibly armed police officers is far too common to be of much probative value, nor does it suggest that a person is involved in drug activity as opposed to other unlawful conduct. The nervousness is especially understandable in Crapser's case as the same group of armed officers had detained him only a week before, and were now back on his doorstep for further interrogation. Moreover, although this court has held that nervousness may in some instances be considered as part of the totality of the circumstances demonstrating reasonable suspicion, all Ninth Circuit cases relying on nervousness involved other factors that were more inculpatory than the two innocuous other factors involved here. *See*, *e.g., United States v. Perez*, 37 F.3d 510, 514 (9th Cir. 1994) (considering nervousness as one of six factors); *United States v. Baron*, 94 F.3d 1312, 1319 (9th Cir. 1996) (same). In Crap-

ser's case, there are *no* other factors suggesting that he was involved in drug activity, other than the immaterial facts that another individual was stopped with a pressure cooker that allegedly belonged to him and that it took him and his female friend Twilligear two minutes to emerge from the motel room. Thus, considering the totality of the circumstances, Galloway did not possess the requisite suspicion necessary to expand the *Terry* stop to include an interrogation regarding Crapser's alleged involvement in drug activity.[6] Because the drug interrogation was not related to the legitimate purpose of the stop — namely determining whether the Gunner Crapser staying with Twilligear in her motel room was the same "Gunner Crapser" named in the warrant — it violated the Fourth Amendment. *Murillo*, 255 F.3d at 1174; *Chavez-Valenzuela*, 268 F.3d at 724.

---

[6]In reaching the opposite conclusion, the majority relies on *United States v. Arvizu,* 534 U.S. 266, 273-74 (2002), in which the Supreme Court held that courts must look to the "totality of the circumstances" in evaluating whether an officer possessed reasonable suspicion and may find reasonable suspicion where a series of facts that in themselves are innocuous would, when taken together, provide a reasonable officer with a " 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu* does nothing to disturb the requirement that the facts, taken collectively, must suggest that criminal activity is afoot. *Arvizu* involved a combination of eight factors which in combination suggested to a reasonable officer that a drug violation was in progress. Id. at 270-72. Here, the facts known to Officer Galloway at the time he questioned Crapser about drugs — that he allegedly owned a pressure cooker, that he appeared nervous, and that it took him a few minutes to exit the motel room with his lady friend, Summer Twilligear after the police knocked on his door — viewed collectively, simply do not suggest that Crapser was involved in criminal activity. They certainly do not provide a "particularized and objective basis" for suspecting that he was engaged in illegal drug activity. After *Arvizu* it is still the function of the courts to review an officer's asserted grounds for suspicion and determine whether collectively they provide an objectively reasonable basis for a *Terry* stop. Accordingly, the majority's reliance on *Arvizu* does not save its misapplication of *Terry.*

III.    *The legality of a* Terry *stop when officers approach a suspect at his residence is a question that need not be resolved here.*

Because I would hold that there was no reasonable suspicion that would justify a *Terry* stop here, I would not address the question whether police officers may request an individual to step outside his home and then conduct a *Terry*-stop as soon as he does. *See Washington,* 387 F.3d at 1068 (expressly not deciding this issue because the detention and search there at issue were unlawful under traditional *Terry* analysis). Were I to reach this issue, I am far from convinced that I would reach the same conclusion as the majority. In *Washington* we noted that, while the Supreme Court has expanded the scope of what constitutes a permissible *Terry* stop over the years, "it has never expanded *Terry* to allow a *Terry*-stop at an individual's home." *Id.* at 1067. We further observed that,

> *Terry's* twin rationales for a brief investigatory detention — the evasive nature of the activities police observe on the street and the limited nature of the intrusion — appear to be inapplicable to an encounter at a suspect's home. Officers on the beat may lose a suspect before the officers have gathered enough information to have probable cause for an arrest. In contrast, officers who know where a suspect lives have the opportunity to investigate until they develop probable cause, all the while knowing where to find the suspect. Because "[n]owhere is the protective force of the Fourth Amendment more powerful than [within] the sanctity of the home," the second rationale for a *Terry*-stop seems almost absent by definition when the intrusion is at the suspect's home.

*Id.* at 1067-68 (internal citations omitted).[7] Moreover, we

---

[7]In reaching the opposite conclusion, the majority relies on our decision in *United States v. Vaneaton,* 49 F.3d 1423, 1426-27 (9th Cir. 1995), in

have repeatedly held that an intrusion *into* someone's home may not be premised on *Terry's* reasonable suspicion standard. *See United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005) ("Certainly, the usual rules pertaining to *Terry* stops do not apply in homes."); *LaLande v. County of Riverside*, 204 F.3d 947, 953-54 (9th Cir. 2000) ("The reasons that gave rise to the rule in *Terry* are simply not applicable to a warrantless entry to seize a person within his home."); *United States v. Winsor*, 846 F.2d 1569, 1577-78 (9th Cir. 1988) (en banc) (rejecting the position that *Terry's* reduced Fourth Amendment standards can be applied to a warrantless entry to search for property within a home, even when the search involves a highly limited intrusion); *see also Payton v. New York*, 455 U.S. 573, 589 (1980) (reversing a state-court ruling that relied on the premise that a warrantless entry to seize a person within a home can be held to *Terry's* lower Fourth Amendment standard).

Because the rationales that underlie the *Terry* doctrine do not support the extension of that doctrine to cases in which the encounter occurs immediately outside the home of a defendant who has been requested to step outside so that he may be questioned, *Washington*, 387 F.3d at 1067-68, and because given the lack of reasonable suspicion no basis for a *Terry* stop exists here, I would follow *Washington* and reserve judgment regarding any such extension of *Terry* to a case in which the issue is properly before us. *Id.* at 1068.

---

which we held that, where police officers use no force, threats, or subterfuge, a person who voluntarily opens the door to his home in response to a knock at the door by police gives up his Fourth Amendment right against warrantless arrest in his home by exposing himself to public view. The majority reasons that, "[i]f an arrest in the doorway is allowed, certainly the lesser intrusion of a *Terry* stop in the hallway is also permissible." Maj. Op. at 172. In reaching this conclusion, it fails to address the fact that the rationales underlying the *Terry* doctrine do not support the extension of the *Vaneaton* rule to the *Terry* context, an observation we made in *Washington*.

IV.  *Crapser's subsequent consent to the search of his motel room did not "purge the taint" of the illegal seizure and interrogation.*

Because Crapser's arrest and his eventual consent to the search of his motel room resulted from an illegal investigatory stop, further inquiry is necessary to determine whether the evidence subsequently obtained should be excluded on that basis notwithstanding Crapser's subsequent consent to the search of his person and the motel room. In general, "evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding . . . consent, unless subsequent events have purged the taint." *United States v. Bautista*, 362 F.3d, 584 592 (quoting *United States v. Chavez-Valenzuela*, 268 F.3d 719, 727 (9th Cir. 2001)). "In determining whether the taint has been sufficiently purged, we ask whether, granting establishment of the primary illegality, the evidence has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* "Elements to be considered in answering this question include temporal proximity between illegality and consent and the presence of intervening circumstances." *Chavez-Valenzuela*, 268 F.3d at 727.

In *Bautista* we held that, where officers entered the defendant's hotel room without a warrant and without consent, the fact that the defendant's wife subsequently consented to the search was not sufficient to purge the taint of the illegal entry because "the government points to no 'significant intervening time, space or event' between the officer's illegal conduct and Mrs. Baustista's consent." *Id.* (quoting *Jones*, 286 F.3d at 1152). Consequently, we held that "Mrs. Bautista's consent was tainted and the evidence obtained pursuant to it should have been suppressed." *Id.*

Here, as in *Bautista*, the government cannot point to any "significant intervening time, space or event" between the

unlawful seizure and Crapser's consent to the search of his person and his motel room. "In other words, the government has not shown that there was a break in the chain of events sufficient to refute the inference that the search . . . [was the] product[ ] of the illegal [seizure]." *Id.* (quoting *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000)). "Consequently, [Crapser's] consent was tainted and the evidence obtained pursuant to it should have been suppressed." *Id.*

I would hold that the district court erred in denying Crapser's motion to suppress. Accordingly, I respectfully dissent.