

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00431-CR

———————————————————

ROLAND POMPA GARZA A/K/A JUAN GARCIA, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1516759D

Before Gabriel, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

Roland Pompa Garza a/k/a Juan Garcia appeals from his conviction and thirty-year sentence for possession of four or more but less than two hundred grams of methamphetamine. In a single point, he challenges the trial court's denial of his motion to suppress statements he made to police and the methamphetamine they found as a result of those statements because he contends that he was immediately arrested without probable cause when officers approached him on the street, that the officers failed to give him *Miranda* warnings after doing so, and therefore that the officers' subsequent questioning of him, leading to the search of his pockets and seizure of methamphetamine, was illegal. We affirm.

**Procedural Background**[1]

A grand jury indicted appellant for intentionally or knowingly possessing four or more but less than two hundred grams of methamphetamine, a second-degree felony. *See* Tex. Health & Safety Code Ann. § 481.115(a), (d). The indictment included an allegation that appellant had committed two prior felonies, increasing the range of punishment for the offense to twenty-five to ninety-nine years' confinement or confinement for life. *See* Tex. Penal Code Ann. § 12.42(d). Appellant's counsel filed a pretrial motion to suppress all evidence related to the methamphetamine appellant was accused of possessing, contending that officers had seized it without a warrant,

---

[1]Because appellant's sole point relates only to the motion to suppress, we will discuss the factual background of the offense, as developed in the suppression hearing, in our discussion of that point.

2

probable cause, or reasonable suspicion in violation of the Fourth and Fourteenth Amendments of the United States Constitution, as well as Article I, Section 9 of the Texas constitution and Article 38.23 of the Code of Criminal Procedure. U.S. Const. amend. IV, XIV; Tex. Const. art. I, § 9; Tex. Code Crim. Proc. Ann. art. 38.23. Appellant also contended that the officers' search exceeded the permissible scope of the law.

The trial court heard and denied the motion to suppress before appellant's jury trial. The jury subsequently convicted appellant, and after appellant pleaded true to the enhancement paragraphs, the trial judge assessed his sentence at thirty years' confinement, within the statutory range. *See* Tex. Penal Code Ann. § 12.42(d).

**Standard of Review**

In reviewing a trial court's ruling on a suppression motion, we apply a bifurcated standard of review, deferring almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but reviewing de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When the trial court makes no explicit fact findings and neither party timely requested findings and conclusions, we infer the necessary fact findings that would support the trial court's ruling if the

3

evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006).

A defendant seeking to suppress evidence bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest. *State v. Martinez*, 569 S.W.3d 621, 623–24 (Tex. Crim. App. 2019) (quoting *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986), *disavowed in part on other grounds by Handy v. State*, 189 S.W.3d 296, 299 n.2 (Tex. Crim. App. 2006)); *Handy*, 189 S.W.3d at 298–99; *see, e.g.*, *Rawlings v. Kentucky*, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561 (1980); *see also Holder v. State*, No. PD-1269-16, 2020 WL 1161774, at *8 (Tex. Crim. App. Mar. 11, 2020) (noting that, generally, court reads Article I, Section 19 no differently than the Fourth Amendment when no significant difference exists between the two texts). Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or, if warrantless, was otherwise reasonable. *Martinez*, 569 S.W.3d at 623–24 (quoting *Russell*, 717 S.W.2d at 9); *Amador*, 221 S.W.3d at 672–73. Here, it is undisputed that the police did not obtain a warrant to search appellant, seize the methamphetamine, or arrest appellant, so the State had the burden to prove reasonableness.

## Applicable Law

In determining whether a search or seizure is reasonable, we must know what type of encounter the defendant had with the police. Interactions between police and the public fall into one of three categories: consensual encounters, investigatory detentions, and arrests. *State v. Woodard*, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011). Both the State and appellant agree that the interaction between appellant and police here was not a consensual encounter, but they disagree as to whether it was a temporary investigative detention or arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S. Ct. 3138, 3150 (1984); *Woodard* 341 S.W.3d at 411; *Kuether v. State*, 523 S.W.3d 798, 807 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). A trial judge's determination of whether an encounter is a temporary detention or arrest is a mixed question of law and fact. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007); *Kuether*, 523 S.W.3d at 807.

Both investigative detentions—*Terry* stops—and arrests are restraints on a person's freedom, but an arrest involves the greater degree of restraint and requires police to give *Miranda* and Article 38.22[2] warnings before questioning the person. *State v. Sheppard*, 271 S.W.3d 281, 290 (Tex. Crim. App. 2008); *Melton v. State*, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990); *White v. State*, 395 S.W.3d 828, 834 (Tex .App.—Fort Worth 2013, no pet.).

---

[2]Article 38.22 warnings are Texas's state counterpart to *Miranda* warnings. *See Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

To determine whether an encounter is an investigative detention or an arrest, Texas courts examine the totality of the circumstances from an objective viewpoint on an ad hoc basis. *Curtis v. State*, 238 S.W.3d 376, 379 (Tex. Crim. App. 2007). Generally, a detention that seems to be something more than would be necessary to simply safeguard the officers and assure the suspect's presence during an investigatory period is an arrest. *Sheppard*, 271 S.W.3d at 291. The primary question in determining whether a person has been detained to the degree associated with an arrest is whether a reasonable innocent person would perceive the detention to be a restraint on movement comparable to a formal arrest, under all of the objective circumstances. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528–1529 (1994); *Florida v. Bostick*, 501 U.S. 429, 438, 111 S. Ct. 2382, 2388 (1991); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). A person may be in custody, necessitating *Miranda* and Article 38.22 warnings, when the person is physically deprived of his freedom of action in any significant way or when an officer creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted. *See Dowthitt*, 931 S.W.2d at 255.

A *Terry* stop must be brief enough to allow the officer to investigate the circumstances that provoked suspicion, which typically "means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer*, 468

U.S. at 439, 104 S. Ct. at 3150. Additionally, police may move the detainee for officer safety or the safety of others. *United States v. Gori*, 230 F.3d 44, 56 (2d Cir. 2000).

Officers may also use such force as is reasonably necessary to effect the goal of the detention, whether it be investigation, maintenance of the status quo, or officer safety. *Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997). Reviewing courts have to allow for the fact that officers must often make quick decisions under tense, uncertain, and rapidly changing circumstances. *Id.* at 118. Factors that we may consider in determining whether the officers' actions indicate an arrest rather than a *Terry* stop include the degree of force employed, the duration of the detention, the nature of the crime under investigation, the degree of suspicion, the location of the detention, the time of day, the suspect's reaction, whether the officer actually conducts an investigation, the efficiency of the investigative process, and whether the officer told the detained person that he or she was under arrest or was being detained only for a temporary investigation. *See Sheppard*, 271 S.W.3d at 291; *Campbell v. State*, 325 S.W.3d 223, 234 (Tex. App.—Fort Worth 2010, no pet.). Even the act of handcuffing a detained person does not necessarily establish an arrest but is only a relevant factor in determining whether a person is in custody. *See Kuether*, 523 S.W.3d at 808.

We will therefore review the evidence presented to the trial court about the nature and scope of the officers' encounter with appellant.

## Evidence Relevant to Suppression Motion

Only one witness testified at the motion to suppress hearing: Fort Worth police officer Humberto Buendia. The State also introduced Buendia's bodycam video into evidence, as well as his report of the incident[3] and a recording of the 911 call that first prompted police to talk to appellant. Because appellant contends the video contradicts Buendia's testimony in some respects, we will detail the evidence from both. Because the parties relitigated the issue at trial,[4] we will also consider appellant's testimony regarding the encounter.

### Buendia's testimony

Buendia testified that he and another officer, Officer Deichert, had been called to investigate a noise complaint. According to the complaint, two Hispanic males were outside a residence all night, making noise that prevented the neighbors from

---

[3]The incident report listed a caller's name, an address within a block or two of where police officers found appellant, the name of the noisy homeowner, and a call-back number for the caller. Buendia talked to the caller after arresting appellant. The caller knew appellant and the neighboring homeowner and thought that they had been scrapping metal at the house.

[4]Although we generally consider only the evidence from the suppression hearing in determining the correctness of a trial court's ruling on a pretrial motion to suppress, we may also consider evidence raised at trial if the parties consensually relitigated the issue. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). Here, the parties relitigated the issue, and the trial court included an Article 38.23 instruction on the lawfulness of the encounter in the jury charge. Tex. Code Crim. Proc. Ann. art. 38.23(a).

sleeping. The two males were the homeowner, identified by name, and another "Hispanic male wearing [a] green shirt, khaki pants, and a blue sling."

En route to the call, Deichert called Buendia because he had seen the man with the blue sling near the offense location. Deichert got caught up on another call, so Buendia went to the location Deichert had indicated and found appellant standing by a taco truck about a block to a block and a half away from the noise complaint's location. According to Buendia, appellant "was the only one with khaki pants, green shirt, blue sling" and was at that time a suspect in a noise complaint, a Class C misdemeanor.

Buendia "asked [appellant] to come over" and "approached [appellant] trying to talk to him." At that time, according to Buendia, appellant was "detained for investigation" and did not have the choice to say no. Buendia said that appellant's hand was in his front pocket at that time. Appellant was not very cooperative, and he was "very jittery." Buendia also called Deichert and asked him to come over so that there would be at least two officers on the call "for officer safety."

Buendia denied grabbing appellant and taking him to a different location. He said he did not tell appellant he was under arrest when he approached him and told him instead, "[W]e just need to talk to you."

Buendia gave his version of what happened next:

So I pulled him aside away from the other people that were at the taco stand[5] because I didn't want to, you know, interfere with their business. Put him over to my vehicle to try to talk to him. He continued to put his hands[6] in his pockets, which for me is an officer safety issue. Anybody who I'm dealing with, if they put their hands in the pocket, I always ask them once or twice, please take your hands out of your pocket.

If they don't, then it's my habit, I do it for officer safety through my training and experience, to pat people down, make sure they don't have any knives or anything that can harm me, that's going to jeopardize my life or somebody else's out there.

Nevertheless, Buendia did not immediately pat down appellant but waited for Deichert to arrive.

Deichert arrived quickly,[7] and the officers "continued to try to talk to" appellant. But appellant did not want to talk to them about the noise complaint. According to Buendia, he said to appellant, "[L]ook, keep your hands out of your pocket, again, do you have anything on you that you're not supposed to, because to me, you putting your hand in your pocket, it throws red flags up." Buendia admitted that appellant had cash in his hand and that he could have patted down appellant at that time "for officer[] safety." He explained that he did not for two reasons related to the presence of the new training officer: (1) the experienced officers "try to lay back

---

[5]Buendia later clarified that he did not physically restrain appellant but just put his hand and on him and said, "[N]o, we're going to walk over here towards the other officers."

[6]The officers' references to "hands" is one of the differences between their testimony and events depicted on Buendia's bodycam video. As described below, the video shows appellant trying to put only one hand in his pocket.

[7]Deichert had a training officer with him, who appears in the bodycam video.

10

as much as [they] can" to avoid forcing officer safety issues around the trainees and (2) to try to allow the trainees to "engage."

Because appellant was not listening to Buendia, Deichert asked appellant if he had anything he was not supposed to have, and then Buendia asked appellant if he had something illegal on him.[8] Appellant answered, "[I]t's what I do." Deichert asked, "[W]hat do you do," to which appellant again responded, "It's what I do."

Deichert then asked appellant if he had "ice," street slang for methamphetamine, on him, and appellant said he did. Buendia then "immediately grabbed [appellant's] hands[ and] put them on top of his head to make sure he wasn't digging in his pockets again." Deichert removed the methamphetamine from the front pocket that Buendia said appellant had "continued to put his hands in." At that point, according to Buendia, the officers arrested appellant and put handcuffs on him. Buendia opined that appellant's admission gave officers legal reason to search and arrest him.

Appellant's sticking his hands in his pockets initially concerned Buendia for officer safety reasons, but after appellant said, "It's what I do," Buendia was concerned that appellant would try to destroy evidence.

---

[8]Buendia said that before searching anyone or patting someone down he "always" asks if the person has something illegal.

**Bodycam video**

The video opens with Buendia driving his squad car and approaching Deichert on the street. It is a bright and sunny morning. Deichert tells Buendia that the man with the sling walked around the corner. Buendia then drives around the corner to the taco truck and parks his squad car along the side of the street across from the taco truck. He crosses the street to where appellant is standing at the window of the taco truck.

Buendia makes a "come here" gesture to appellant with his hand and appellant complies. Appellant's arm is in a sling[9] and that arm's hand is in his pocket. He is holding cash in the other hand. Buendia tells appellant, "Get your hands outta your pocket for me." Buendia then tells appellant that he is there to investigate what went on in the backyard; appellant denies being in a backyard, apparently confused at what Buendia is asking him, and instead gestures toward the area behind the taco truck and says he came from that direction. Appellant's speech is garbled and at times incomprehensible, but he does not appear to have trouble speaking or understanding English, nor does he say that he does.

Buendia tells appellant, "Somebody called on you." As the two are talking, still in front of the taco truck, appellant touches his pocket with his sling arm. He tells

---

[9]On the video, appellant's shirt looks more gray than green, but he is wearing a blue sling.

Buendia the name of the homeowner with whom he had been staying.[10] Buendia asks appellant for identification, but appellant tells him he does not have any.

Buendia then says to appellant, "Let's stand over here for right now," and the two start walking across the street, appellant a little in front of and to Buendia's left. As the two are crossing the street, Buendia takes appellant by the arm and steers him toward the police car across the street, saying at the same time that he will let Buendia buy his taco afterwards. A second police car is now parked behind Buendia's so that there is a gap between them. Buendia gestures appellant to the gap, but appellant instead turns around and leans against Buendia's police car, crossing his arms in front of him. Deichert and the officer in training are standing by the second police car, to appellant's left, and Buendia is standing in front of appellant.

Appellant tells Buendia that he was not in anyone's backyard but that he had come straight from his friend's house. He questions why the officers are talking to him, and Deichert tells him that someone called about him and that the officers were going to talk to that person next. Appellant appears to try to put his hand in his pocket, and Deichert tells him to keep his hands out of his pockets. Appellant complies. Deichert asks appellant his name and birthdate, which appellant gives him, even spelling his first name.

After appellant answers Deichert's questions, Buendia asks, "Do you got anything on you you're not supposed to have?" Appellant looks away evasively and

---

[10]It is the same name the complainant gave the 911 dispatcher.

says, "This is crazy." After Buendia repeats the question, Deichert asks, "No pipes, no nothing?" which Buendia repeats. Appellant says that he does not have any pipes but then says something hard to make out. Buendia explains to appellant that he keeps sticking his hands in his pockets, which tells the officers he has something. Buendia then asks him, "What do you have?" and appellant responds that he has "what I do." Deichert asks, "Ice?" He then asks appellant whether he deals it. Appellant incredulously denies dealing but then says, "That's what I do." It is at this point, slightly over two minutes after gesturing to appellant at the taco truck, that Buendia tells appellant to put his hands up and Deichert searches appellant, finding methamphetamine in his pocket.

**Additional evidence at trial**

After denying the motion to suppress, the trial court granted appellant a running objection for the trial. Appellant testified and offered his own version of the stop leading to the search of his pockets and his arrest. According to appellant, when Buendia approached him at the taco truck, Buendia stood "right close up" and made appellant "[k]ind of nervous and scared." He got "really . . . nervous and scared" when Buendia had him go to the police car. He did not want to talk to the police and felt like they were picking on him, as if he were being mentally "beat up." But he admitted later that he always was scared of law enforcement and nervous around them. He described Buendia's physical interaction with him as "grab[bing] me by my hand, throw[ing] me -- pull[ing] me to the side."

14

## Temporary Detention, Not Arrest

Appellant contends that he was arrested, rather than merely detained, before he began answering the officers' questions about whether he had anything illegal because Buendia grabbed him by the arm and "continue[d] to physically restrain him [while] lead[ing] him to the spot where" Buendia and Deichert began questioning him.

Based on our review of the entire record, however, we defer to the trial court's implied finding that Buendia's force was minimal and tailored to the purpose of moving appellant to a better place to talk with Buendia and the other two officers. His hand on appellant's arm was to guide appellant in the direction of the police cars. Rather than standing where Buendia indicated, appellant apparently felt free to instead lean against Buendia's police car. This took place in the morning, out in the open by the side of the street, with other people around.

Although the officers were investigating only a Class C misdemeanor[11]—a ticketable offense—they did investigate that offense, for which they had a high degree

---

[11]Although appellant argued in the trial court that officers did not have reasonable suspicion to temporarily detain him to investigate the noise-disturbance complaint, he does not make that argument on appeal. The State produced evidence at the suppression hearing that the 911 caller who made the noise complaint identified himself to the dispatcher, gave his address and phone number, and provided the name of the next-door neighbor making the noise, as well as a description of his companion as an approximately thirty-five-year old male, wearing a green shirt and khaki pants, with a blue arm sling. One of the responding officers was able to interview the complainant after appellant's arrest for the unrelated drug offense. *See Brother v. State*, 166 S.W.3d 255, 257 (Tex. Crim. App. 2005); *Pipkin v. State*, 114 S.W.3d 649, 655–56 (Tex. App.—Fort Worth 2003, no pet.); *see also Williams v. State*, No. 02-17-00012-CR, 2018 WL 547598, at *5–6 (Tex. App.—Fort Worth Jan. 25, 2018, pet. ref'd) (mem.

of suspicion, telling appellant why they were talking to him and letting him give his own explanation of where he had been. They attempted to find out his explanation for the noise. Also, both Buendia and Deichert asked appellant routine identification questions.

To this point, approximately a minute and a half after Buendia first approached appellant, the encounter does not show indicia that would lead a reasonable innocent person to believe that his freedom of movement was restrained to the degree of a formal arrest. *See, e.g., Cook v. State*, No. 07-11-00390-CR, 2013 WL 5782915, at *3 (Tex. App.—Amarillo Oct. 23, 2013, pet. ref'd) (mem. op., not designated for publication); *Barriere v. State*, No. 03-09-00026-CR, 2010 WL 3369858, at *5–7 (Tex. App.—Austin Aug. 26, 2010, no pet.) (mem. op., not designated for publication); *cf. State v. Whittington*, 401 S.W.3d 263, 273 (Tex. App.—San Antonio 2013, no pet.) (citing and distinguishing cases in which temporary detention was converted to arrest by an unreasonably strong showing of force or authority or because of absence of need to maintain status quo or officer safety). But what begins as a noncustodial detention may become a custodial arrest as a result of police conduct during the encounter, such as asking questions unrelated to the detention's purpose that unnecessarily prolong the detention's scope. *Balentine v. State*, 71 S.W.3d 763, 770 (Tex. Crim. App. 2002); *Dowthitt*, 931 S.W.2d at 255; *see United States v. Pack*, 612 F.3d 341,

---

op., not designated for publication) (citing *Brother* and *Pipkin*), *cert. denied*, 139 S. Ct. 840 (2019).

350 (5th Cir. 2010) ("[A]n officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop."). Thus, we will consider whether Buendia's questions about appellant's possession of illegal items changed the nature of the encounter into an arrest.

When Buendia asked appellant if he had something on him he was not supposed to have, Deichert had just finished taking appellant's identifying information. There was no indication that he was finished gathering information. Both officers had already asked appellant to take his hand out of his pocket and had been able to observe appellant's agitated behavior and listen to his garbled speech. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000) (noting that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.); *Anderson v. Caver*, Civ. No. 3:07-0073, 2008 WL 160781, at *5 (M.D. Tenn. Jan. 15, 2008) (noting that an officer's requests for a detained person to remove his hands from his pockets are acceptable methods of ensuring officer safety during an encounter).

Appellant's evasive look and answer when Buendia first asked him about anything illegal led naturally to the additional questions, to which appellant voluntarily answered that "ice" was what he had. Only about thirty seconds elapsed from the time Buendia first asked appellant whether he had anything illegal to the time Deichert reached into appellant's pocket and found methamphetamine after appellant's admission. Thus, neither Buendia's nor Deichert's questions unnecessarily

17

prolonged the stop. *See, e.g.*, *United States v. Kindelay*, No. CR 06-442-PCT-JAT, 2006 WL 3096680, at \*1–4 (D. Ariz. Oct. 31, 2006) (holding that encounter remained temporary detention when police officers had reasonable suspicion to investigate whether appellant had been involved in fight, did not draw weapons or tell defendant he was under arrest, but asked appellant what was in his pockets when he kept reaching for them); *State v. Stevenson*, 958 S.W.2d 824, 829 n.7 (Tex. Crim. App. 1997) (noting than an officer's asking questions during a continuing investigation, which included field sobriety tests, did not escalate temporary detention into arrest); *cf. United States v. Shabazz*, 993 F.2d 431, 436–37 (5th Cir. 1993) (holding that officers' questioning during traffic stop for observed Class C misdemeanor, during which they obtained consent to search vehicle, was not a Fourth Amendment violation because officers were still engaged in investigating the original purpose of the stop); *Muniz v. United States*, No. A-07-CR-172(3)-SS, 2012 WL 13093405, at \*2–4 (W.D. Tex. Apr. 11, 2012) (holding that consent to search given either while officer was completing computer check during temporary detention, or after computer check was completed during consensual encounter after completion of detention, was valid).

During the suppression hearing, the State summarized the encounter for the trial court: "They're asking him about a noise complaint. And based on his behaviors and movement, they ask him if he has drugs and he says yes." Appellant's voluntary statements that he had "what I do" and that he had "ice"—while officers were still performing their investigation of the noise complaint—gave officers probable cause

18

to search appellant's pocket. *See Nuttall v. State*, 87 S.W.3d 219, 221–23 (Tex. App.—Amarillo 2002, no pet.) (per curiam); *see also Malone v. State*, No. 01-14-00054-CR, 2015 WL 1869453, at *4 (Tex. App.—Houston [1st Dist.] Apr. 23, 2015, pet. ref'd) (op. on reh'g) (mem. op., not designated for publication) (following *Nuttall*).[12] Because the officers' actions were related to the purpose of the initial stop, to maintaining appellant's presence and the status quo while performing that investigation, and to determining how to maintain officer safety while trying to finish that investigation, we hold that the trial court correctly concluded that appellant was not under arrest when the officers asked the questions leading to the search and, thus, that they were not required to give appellant *Miranda* and Article 38.22 warnings before asking them.

## Conclusion

We conclude that the trial court properly denied appellant's motion to suppress. Therefore, we overrule his sole point and affirm the trial court's judgment.

/s/ Wade Birdwell
Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 16, 2020

---

[12]Appellant faults the officers for not performing a pat down search before asking their questions, but he admits that they are authorized to perform such a search during a detention for officer safety. Buendia's questions were no more intrusive than a pat down. Appellant's voluntary answers—rather than the look or feel of an item in his pocket—are what gave the officers probable cause to search. Because they had probable cause for the search, a pat down was not required. *See Nuttall*, 87 S.W.3d at 223.